**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ATI GOVERNMENT SOLUTIONS, LLC
47 East South Street, Unit 002
Frederick, Maryland 21701;

SF CONSULTING SERVICES, LLC
47 East South Street, Unit 002
Frederick, Maryland 21701;

SF DESIGN SOLUTIONS, LLC
47 East South Street, Unit 002
Frederick, Maryland 21701;

SF NETWORK SERVICES, LLC
47 East South Street, Unit 002
Frederick, Maryland 21701;

SF TRANSFORMATION SERVICES, LLC
47 East South Street, Unit 002
Frederick, Maryland 21701;

SFS GLOBAL, LLC
745 Joaquin Street
Susanville, California 96130;

SFS GLOBAL/TIBURON JV
1626-B Main Street
Susanville, California 96130;

FIRMADGE CRUTCHFIELD
47 East South Street, Unit 002
Frederick, Maryland 21701;

SCOTT DEUTSCHMAN
47 East South Street, Unit 002
Frederick, Maryland 21701;

and

MARINA MULYAYEVA
47 East South Street, Unit 002
Frederick, Maryland 21701

Plaintiffs,

Civil Case No. ______________________

v.

UNITED STATES SMALL BUSINESS ADMINISTRATION
409 Third Street, S.W.
Washington, DC 20416; and

KELLY LOEFFLER, in her official capacity as Administrator of the United States Small Business Administration
409 Third Street, S.W.
Washington, DC 20416;

Defendants.

## COMPLAINT

Plaintiffs ATI Government Solutions, LLC ("ATI"); SF Consulting Services, LLC ("SF Consulting"); SF Design Solutions, LLC ("SF Design"); SF Network Services, LLC ("SF Network"); SF Transformation Services, LLC ("SF Transformation"); SFS Global, LLC ("SFS Global"); SFS Global/Tiburon JV ("SFS–GT"); Firmadge Crutchfield; Scott Deutschman; and Marina Mulyayeva, by and through their undersigned counsel, bring this case against the United States Small Business Administration ("SBA" or the "Agency") and its Administrator Kelly Loeffler, and state as follows:

## INTRODUCTION

1. This is a case about a brazen abuse of government power by the Defendants, SBA and its Administrator, Kelly Loeffler, to interfere with contracts, undermine government efficiency, and destroy a small business, based on the false, misleading, and unfounded allegations of an untrustworthy known online provocateur. It is a case about a government agency that abandoned its solemn duty to exercise diligence and rationality in making decisions on behalf of the government, instead seizing on an opening to advance its own political agenda while

disregarding the due care and reasonable judgment Americans expect from their government.

2. The SBA was established in 1953 with a mission to "help Americans start, build, and grow small businesses." The SBA identifies "helping small businesses compete for federal contracting opportunities" as one of its core services.[1]

3. On February 20, 2025, Defendant Loeffler assumed office as Administrator of the SBA, and promised to "restore the agency to its founding mission of growing small business, fueling free enterprise, and driving economic resilience."[2]

4. This promise soon proved empty. In the space of eight months, whether as a result of gross incompetence or bad faith, the Defendants seized on deceptive YouTube videos to destroy an American small business built on the relentless hard work and personal sacrifice of a federally-recognized American Indian tribe and a group of dedicated professionals.

5. ATI and its affiliates are all wholly or majority-beneficially owned by the Susanville Indian Rancheria Tribe ("SIR" or the "Tribe"), and ATI's business activities, including government contracts, are key sources of income for the Tribe, whose population relies on the success of the Tribe's commercial ventures as they work to lift their community out of poverty. SIR's Tribal Business Council, made up entirely of enrolled members of SIR, has worked to establish these tribal businesses as indispensable government contracting partners. Before its suspension, ATI provided vital services to the U.S. federal government while aiming to deliver economic relief and future employment and business management opportunities to the Tribe that ATI ultimately serves.

---

[1] U.S. Small Bus. Admin., *About SBA*, https://www.sba.gov/about-sba/ (last visited Oct. 18, 2026).

[2] U.S. Small Bus. Admin., *SBA Administrator Kelly Loeffler Issues Statement* (Feb. 20, 2025), https://legacy.sba.gov/article/2025/02/20/sba-administrator-kelly-loeffler-issues-statement (last visited Oct. 18, 2026).

6. The Tribe's business ventures flourished in recent years, in part as a result of their certifications by Defendant SBA's statutorily-mandated 8(a) Business Development program. That program has assisted businesses owned and operated by members of disadvantaged communities in obtaining government contracts for nearly half a century, empowering Alaskan Native, Native Hawaiian, and American Indian tribes, among other socially and economically disadvantaged groups, to "expand[] their footprint in the federal marketplace."[3]

7. "The 8(a) program does not guarantee contract awards[.]" Rather, "[t]he 8(a) certification qualifies [businesses] as eligible to *compete* for the program's sole-source and competitive set-aside contracts," including by "pursu[ing] joint ventures with established businesses to increase capacity."[4]

8. Consistent with the 8(a) program's avowed purpose, in establishing and operating ATI and its affiliates, the Tribe leverages partnerships and joint ventures with established companies to pursue federal contracting opportunities. These partnerships allow the Tribe to expand its capacity to complete the work it is hired to perform, and to train its members to take over technical, skill-based, and managerial roles in the businesses as they grow.

9. James O'Keefe, an infamous and discredited internet provocateur, took issue with ATI's success. On October 20, 2025, donning a wig and fake glasses, the disgraced, self-published instigator scammed a low-level former employee at ATI (whom he falsely described as senior corporate leadership) into meeting with him under false pretenses, and surreptitiously recorded that meeting using a hidden camera. In the obviously-edited video, the employee was baited into appearing to tacitly agree with the interviewer's own mischaracterizations of ATI's operations and

---

[3] U.S. SMALL BUS. ADMIN., *SBA Business Certifications: 8(a), WOSB, HUBZone, SDVOSB*, https://www.sba.gov/certifications/#8a-program (last visited Oct. 18, 2026).
[4] *Id*. (emphasis added).

the 8(a) program.[5] This "report" of the employee's comments was aired on O'Keefe's social media channels, alongside his own selective and deceptive commentary on the conversation, falsely characterizing the employee's inaccurate descriptions of the 8(a) program as insider testimony about ATI itself.




10. The video is obviously heavily edited; it clips short soundbites of conversation and snapshots of facial expressions, rearranges the clips and audio, and then interweaves the spliced hidden camera content with a direct-to-camera monologue in which O'Keefe tells the story that he hoped to tell in the first place: that ATI was engaged in fraud.

11. But this story is not true.

12. Neither ATI nor any of the Tribe's other commercial ventures have engaged in fraud.

13. The characterizations of the 8(a) program, and of ATI in particular, are not true.

14. O'Keefe did not contact ATI prior to posting his video and gave ATI no opportunity to respond to his spurious and false allegations before publication.

---

[5] Given that the employee's comments in the video are spliced and all purported context is provided by the narrator, it is likely the employee's comments are not accurately or completely reported. The employee has reported that she was not accurately quoted and the video is misleading.

15. Ordinarily, a facially unreliable social media video like this would (appropriately) go unnoticed by SBA or any other government agency. It goes without saying that the government should not make major decisions that affect taxpayers, businesses, and federal government customers based on the baseless claims of a discredited undercover internet personality wearing a preposterous disguise. Indeed, there exists substantial federal case law, and even more guidance from SBA's own internal tribunals, instructing SBA that relying on such inherently unreliable information is arbitrary and capricious.

16. Yet that is precisely what SBA did. The SBA took the obviously edited video at (laughable) face value and relied on that video *alone* to suspend ATI from all federal government contracting.

17. Only hours after this video was published, Defendant Loeffler reposted it to her X account, announcing an "investigation," and bizarrely linking the allegations to "every other government program rooted in DEI."


Kelly Loeffler
@SBA_Kelly

SBA has launched an investigation into ATI Government Solutions and Susanville Indian Rancheria.

This is why we have been conducting a full review of the 8(a) Program, ostensibly designed to help "socially and economically disadvantaged" small businesses compete in the federal marketplace. Yet, what we've discovered so far has been institutionalized abuse, which potentially amounts to billions of dollars in federal contracts that are run through shell companies, fraudulent pass-throughs, and other schemes.

That's why in February, the SBA took immediate action to slash 8(a) contracting goals across the federal government. In June, we launched an audit of the program to review every 8(a) contract for the last 15 years. And in July, we rescinded the contracting authority of USAID, which was involved in a massive bribery scandal.

@JamesOKeefeIII has exposed an important truth. Like every other government program rooted in DEI, the 8(a) Program is rife with grift and fraud.

Under my leadership, the SBA is committed to restoring integrity and implementing strong reforms to protect U.S. taxpayers from further abuse. The full audit is ongoing and whistleblowers may contact sbax.sba.gov/oigcss/

18. The *next day*—plainly *not* after an "investigation"—SBA suspended ATI and its

executives (the individual Plaintiffs in this case) from all federal government contracting, by issuing a Notice of Suspension (the "FAR Suspension Notice") that invoked Federal Acquisition Regulation ("FAR") 9.407, which permits suspension of contractors only upon "adequate evidence" that the Government's interests are in need of immediate protection, usually due to fraud or other specified criminal or wrongful conduct. 48 C.F.R. § 9.407–1(b)(1).

19. Upon issuing the suspension, Defendant Loeffler posted on social media that SBA had "been in contact with the Department of Justice and [would] continue to provide status updates as they become available."



Post

Kelly Loeffler
@SBA_Kelly

As of today, the SBA has officially suspended ATI Government Solutions, which is majority-owned by Susanville Indian Rancheria, as well as three of its executives, from conducting any new business with the federal government.

While we continue our investigation, ATI and its referenced executives will not be permitted to bid for federal contracts, subcontracts, or set-asides, and will not be able to receive any federal assistance.

We have been in contact with the Department of Justice and will continue to provide updates as they become available.

As a reminder, whistleblowers with any information about these companies - or any suspected contracting abuse - may submit a tip at: sbax.sba.gov/oigcss/.

Kelly Loeffler @SBA_Kelly · Oct 20, 2025
SBA has launched an investigation into ATI Government Solutions and Susanville Indian Rancheria.

This is why we have been conducting a full review of the 8(a) Program, ostensibly designed to help "socially and economically disadvantaged" small...

11:47 AM · Oct 22, 2025 · **1.4M** Views

369 2.2K 8.9K 241

20. The existence of an active suspension is recorded on the System for Award Management (SAM.gov) profile for a suspended contractor. However, suspension notices are generally not otherwise made public.

21. Nevertheless, before or shortly after SBA issued the FAR Suspension Notice, SBA, on information and belief, took the unprecedented step of leaking the FAR Suspension Notice, including each of its demonstrably false and conclusory allegations, to the same individual who created and publicized the outlandishly edited videos. He in turn posted the FAR Suspension Notice to his social media channels even before some of ATI's management team—and virtually all of ATI's employees—knew it had been issued.

22. SBA did not provide ATI with notice of its impending decision or an opportunity to respond to the video's allegations or otherwise contest the action prior to the suspension or leaking the FAR Suspension Notice to the original source of the false allegations—a fundamental betrayal of due process.

23. SBA included boilerplate comments about adequate evidence in the FAR Suspension Notice, but the mandatory "supporting" documentation SBA is required to maintain demonstrates that no such "adequate evidence" existed at the time of SBA's decision. The administrative record underlying SBA's suspension decision (a copy of which is appended hereto as **Exhibit A**) consists of only: (1) a completely innocuous LexisNexis SmartLinx Comprehensive Business Report, spanning 9 pages, that lists ATI's corporate registration information and the identities of its officers; (2) a similarly innocuous SAM.gov[6] printout reflecting the government contracts that ATI obtained, and (3) an email reference to three "videos produced by the O'Keefe

---

[6] SAM.gov is an official website of the U.S. Government that, among other things, provides public access to information concerning federal contractors. *See* U.S. GEN. SERVS. ADMIN., *About This Site*, SAM.GOV, https://sam.gov/about/this-site (last visited Oct. 18, 2026).

Media Group[.]"[7]

24. On October 23, 2025, SBA suspended ATI from the 8(a) program, with the decision predicated on the same (incorrect) bases for suspension included in the FAR Suspension Notice.

25. O'Keefe, meanwhile, posted to social media that the "Anti-Trust division [sic] of the DOJ" had opened an investigation based on his "recent story."




26. Weeks later, on November 7, 2025, SBA issued additional FAR suspensions

---

[7] The videos on which SBA purports to have based its suspension are: O'Keefe Media Grp., *"Pass-Throughs," "Shell-Companies," & $100 Billion Federal Contracting Scam*, YouTube (Oct. 20, 2025), https://www.youtube.com/watch?v=B_CtRCLaSbY (last visited Oct. 18, 2026); O'Keefe Media Grp., *BREAKING: ANOTHER Federal Contractor Admits to $100M Fraud & Outsourcing to Accenture*, YouTube (Oct. 22, 2025),https://www.youtube.com/watch?v=KKLNbz4yRvM (last visited Oct. 18, 2026); O'Keefe Media Grp., *CONFRONTING Former ATI Employee Who Exposed MILLIONS in Government Contract Fraud*, YouTube (Oct. 23, 2025), https://www.youtube.com/watch?v=F5jX4zE_IR0 (last visited Oct. 18, 2026).

against SF Consulting, SF Design, SF Network, SF Transformation, SFS–GT, and SFS Global, all due to their affiliation with Crutchfield.

27. Defendant Loeffler again took to social media, claiming, without any evidence, a vast conspiracy by ATI and Crutchfield to defraud the Government. These claims were made without regard for the facts, and shortly after Defendant Loeffler posted, Crutchfield began receiving death threats. Defendant Loeffler added that the companies' "names have been provided to law enforcement."




28. Each of these companies is a subsidiary of one of the Susanville Indian Rancheria tribe's SBA-approved tribal holding companies—already known to SBA for years—not some nefarious network of fraudster companies, as Defendant Loeffler portrayed them to be. Any reasonable person with knowledge of SBA's own program regulations and internal systems or who had exercised due care to read those regulations would understand this form of SBA-approved

tribal business structure. Notably, four of the companies had never bid upon or even held a contract, much less been involved in the SBA's 8(a) Business Development Program.

29. On November 19, 2025, in a cover email transmitting the administrative record on which SBA based the suspensions, SBA employee Edmund Bender identified three YouTube videos as purported bases for the FAR 9.407 suspensions. One was the laughably altered and obviously deceptive October 20 video that Defendant Loeffler had reposted on X, described *supra* in Paragraph 9. The other two videos that SBA supposedly relied on in reaching its suspension decision were similarly outlandish and deceptive, but notably, they had *not yet been published* at the time of the suspension. In other words, SBA claimed that it decided to suspend ATI based on videos that had not yet been published.

30. Upon request, Bender later confirmed that SBA "did not receive" the unedited video footage and that it had not received metadata for the videos, admitting instead that SBA only "accessed the videos through YouTube."

31. Within 30 days of SBA's FAR suspension, ATI and its executive team comprehensively and conclusively established that the allegations in the video (and in the two subsequent videos improperly cited by SBA as the basis for suspension) were demonstrably false. ATI submitted voluminous evidence that squarely contradicted SBA's narrative, conferred with SBA, and, on several occasions, requested an explanation from SBA as to what could possibly justify the suspension remaining in force.

32. The reality is that the 8(a) Program is one of the most heavily-regulated SBA contracting programs, with the SBA requiring extensive operational and financial records to be submitted on an annual (and sometimes more frequent) basis. At the time of its suspension of ATI, SBA had ample information already in its possession from years of timely and compliant

submissions by ATI, to understand the patent falsity of the allegations in the video and provide ATI with the process it is required by law to afford. Instead, SBA ignored the information it already had in its possession.

33. For over a full year, SBA has stalled, stammered, and deflected, refusing to budge on ATI and its affiliates' suspensions, and failing to address the evidence ATI has offered in support of its request to lift the suspension.

34. Rather than admit its gross mistake, SBA has embarked on an effort to publicly defame ATI, and to use ATI as a scapegoat to justify a broader attack on the SBA's 8(a) program. The Agency cited the ATI "allegations" as a reason to pursue an audit of the entire 8(a) program and its over 4,000 small business participants, in December 2025, linking to Defendant Loeffler's social media posts about ATI in a press release in which the Agency boasted that it took "immediate action to suspend numerous executives and contractors following allegations of fraud."[8]

35. SBA's public admission that the Plaintiffs' suspension followed only "allegations" of fraud invented by the O'Keefe Media Group, alongside Bender's private admission that the videos were the basis of ATI's suspension, leaves no doubt that the Plaintiffs were suspended without any basis in law or fact.

36. A full year has now passed – a year in which Plaintiffs and their businesses have been irreparably destroyed because SBA acted outside the law. Despite repeated entreaties and consistent advocacy by ATI, and a lack of basis for the Suspension, the SBA has refused to lift it. Meanwhile, SBA repeatedly promised a resolution by certain self-imposed deadlines, only to fail

[8] U.S. SMALL BUS. ADMIN., *SBA Orders All 8(a) Participants to Provide Financial Records* (Dec. 5, 2025), https://legacy.sba.gov/article/2025/12/05/sba-orders-all-8a-participants-provide-financial-records (last visited Oct. 18, 2026).

to meet each deadline.

37. To the contrary, and despite having no evidence whatsoever—let alone adequate evidence—to justify ongoing suspension and having substantial evidence entirely refuting all of the stated bases for suspension since at least November 20, 2025, on information and belief, SBA officials reached out to one or more Department of Justice or other law enforcement officials in bad faith to encourage those officials to improperly investigate Plaintiffs or otherwise request an extension of the unlawful suspension. Without such an investigation or request, SBA would be unable to maintain ATI's suspension as a matter of law. *See* 48 C.F.R. § 9.407-4.

38. Then, on October 21, 2026—a year after SBA first suspended ATI, and one day *after* the suspension was required to be lifted by operation of law—SBA informed Plaintiffs that their suspension would be extended by another six months.

39. As the basis for their extension, SBA cited FAR 9.407-4(b). That regulation permits SBA to extend an otherwise-expiring suspension if "an office of a U.S. Assistant Attorney General, U.S. Attorney, or other responsible prosecuting official requests its extension."

40. No law enforcement official has ever contacted any of the Plaintiffs about any "investigation," and neither DOJ nor any other "responsible prosecuting official" has made any request for information of any kind to any of the Plaintiffs. Defendant Loeffler's public declarations that she would share O'Keefe's videos with law enforcement are the only apparent basis of any law enforcement investigation into Plaintiffs.

41. On information and belief, SBA enlisted DOJ's assistance to persist in its violation of Plaintiffs' rights, still without providing any basis for its suspension.

42. On information and belief, the apparent DOJ investigation is based on the same baseless, invented (and repeatedly refuted) O'Keefe videos as the SBA suspensions.

43. Only one conclusion is justified: the SBA suspended ATI in bad faith, maintains its suspension in bad faith, and refuses to address the damage it has caused as a result of this ongoing and pervasive bad faith.

44. As of the date of this filing, Plaintiffs remain suspended and excluded from all government contracting, as depicted on SAM.gov:

EXCLUSIONS

There may be instances when an individual or firm has the same or similar name as your search criteria, but is actually a different party. Therefore, it is important that you verify a potential match with the excluding agency identified in the exclusion's details. To confirm or obtain additional information, contact the federal agency that took the action against the listed party. Agency points of contact, including name and telephone number, may be found by navigating to the Agency Exclusion POCs page within Help.

Active Exclusions

| Excluding Agency | Classification | Active Date | Termination Date |
| --- | --- | --- | --- |
| SMALL BUSINESS ADMINISTRATION | Firm | 2025-10-21 | 2027-04-21 |

## JURISDICTION AND VENUE

45. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims under the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq*. ("APA"), and the Due Process Clause of the Fifth Amendment of the United States Constitution all arise under federal law.

46. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because Defendant Loeffler is "an officer or employee of the United States or any agency thereof" and SBA is "an agency of the United States;" and because a substantial part of the events or omissions giving rise to the claim occurred in the District of Columbia, including at SBA Headquarters.

## PARTIES AND KEY NONPARTIES

### I. The Tribe

47. The Susanville Indian Rancheria is a federally recognized Indian tribe, comprised of approximately 1,500 members, whose tribal land is located in Susanville, California. Established in 1923, SIR was originally created to benefit homeless California Indians from four separate tribes displaced from their ancestral lands—the Maidu, Paiute, Pit River, and Washoe tribes. The Tribe is governed by its General Council, which is composed of tribal members who are at least 18 years of age. The General Council delegates the responsibilities of running the day-to-day business of the Tribe to its Tribal Business Council, which is a seven-member board of tribal members elected by the General Council. Among other activities, the Tribal Business Council creates and oversees business ventures that generate revenue for the Tribe.

48. SIRCO Federal Services, Inc. ("SFSI") is one of three wholly-owned tribal holding companies owned and operated under the laws of the Susanville Indian Rancheria and operated through a Board of Directors. At all relevant times, the SFSI Board of Directors has been constituted entirely of members of the Tribe.

### II. Plaintiffs

49. Plaintiff ATI is a limited liability company engaged in the IT, engineering, and professional staffing industries. It is organized and operated under the laws of the Susanville Indian Rancheria, registered as a foreign/out-of-state limited liability company in Maryland, and is majority owned by SFSI, a tribal holding company which is itself wholly owned by the Tribe.

50. Plaintiffs SF Consulting; SF Design; SF Network; and SF Transformation are also limited liability companies, organized and operated under the laws of Maryland, and are all also wholly-owned subsidiaries of SFSI.

51. Plaintiff SFS Global, LLC ("SFS Global") is a limited liability company, organized and operated under the laws of the Susanville Indian Rancheria, and is wholly owned by SFSI.

52. Plaintiff SFS Global/Tiburon JV ("SFS–GT") is a limited liability company, organized and operated under the laws of the Susanville Indian Rancheria, and is majority owned by SFS Global.

53. Plaintiffs SF Consulting, SF Design, SF Network, SF Transformation, SFS Global, and SFS–GT are referred to collectively herein as SFSI's "affiliates."

54. Plaintiff Firmadge Crutchfield is the Chief Executive Officer of ATI. Crutchfield is an adult resident and citizen of the Commonwealth of Pennsylvania.

55. Plaintiff Scott Deutschman is the Corporate Development Officer of ATI. Deutschman is an adult resident and citizen of the Commonwealth of Virginia.

56. Plaintiff Marina Mulyayeva is the Chief Financial Officer of ATI. Mulyayeva is an adult resident and citizen of the Commonwealth of Pennsylvania.

57. Plaintiffs Crutchfield, Deutschman, and Mulyayeva are collectively referred to herein as the "Individual Plaintiffs."

**III. <u>Defendants</u>**

58. The United States Small Business Administration ("SBA" or the "Agency") is an independent agency of the United States Government, organized and operated under the laws and regulations of the United States of America. Created in 1953, the SBA is responsible for the lawful administration of various small business programs, including the statutorily-mandated 8(a) Business Development Program. Part of SBA's mission is to aid, counsel, assist, and protect the interests of small business concerns; to preserve free competitive enterprise; and to maintain and strengthen the overall economy of our nation. SBA is headquartered at 409 Third Street, S.W.,

Washington, D.C. 20416.

59. Defendant Kelly Loeffler is, at the time of this filing, the Administrator of SBA. Defendant Loeffler has final authority and control over the SBA's operations, including SBA's actions described herein, subject to the laws of the United States. Defendant Loeffler is sued in her official capacity pursuant to 15 U.S.C. § 634(b)(1), which permits the Administrator of the SBA to "sue and be sued . . . in any United States district court" "[i]n the performance of, and with respect to, the functions, powers, and duties vested in [her] by" the SBA's organic statute.

## IV. James O'Keefe and his Companies

60. Since at least 2006, internet personality James O'Keefe has been collecting and manipulating hidden camera footage to create deceptive internet content implicating his perceived political enemies, all under the guise of so-called "investigative journalism." The narratives he has pushed in his videos have consistently been debunked, and his tactics have repeatedly generated criminal scrutiny and civil litigation, including a federal criminal conviction, government investigation of his covert recording practices, and civil suits that he has settled.[9] He even

[9] *See, e.g.*, Judgment in a Criminal Case, *United States v. O'Keefe*, No. 10-cr-0081 (E.D. La. May 27, 2010) (O'Keefe pleaded guilty to entering federal property under false pretenses after he and others entered Senator Mary Landrieu's New Orleans office while posing as telephone workers during an undercover operation); Stephanie Condon, *James O'Keefe Avoids Jail Time*, CBS NEWS (May 26, 2010), https://www.cbsnews.com/news/james-okeefe-avoids-jail-time/ (last visited Oct. 18, 2026); OFFICE OF THE ATT'Y GEN., CAL. DEP'T OF JUST., *Report of the Attorney General on the Activities of ACORN in California* 2, 17 (Apr. 1, 2010), https://oag.ca.gov/system/files/attachments/press_releases/n1888_acorn_report.pdf (last visited Oct. 18, 2026) (reporting that O'Keefe and Hannah Giles received immunity from prosecution in exchange for producing unedited ACORN recordings and concluding that application of California privacy law "strongly suggests" their covert recordings violated state law); *Conway-Russell v. O'Keefe*, No. 2:10-cv-00276 (E.D. Pa. May 13, 2010) (dismissed following settlement), cited in *Democracy Partners, LLC v. Project Veritas Action Fund*, 285 F. Supp. 3d 109, 113 n.2 (D.D.C. 2018); Tony Perry, *Conservative Activist Pays $100,000 to Former ACORN Worker*, L.A. TIMES (Mar. 7, 2013), https://www.latimes.com/local/la-xpm-2013-mar-07-la-me-0308-acorn-20130308-story.html (last visited Oct. 18, 2026) (reporting O'Keefe's $100,000 settlement of Juan Carlos Vera's suit arising from O'Keefe's surreptitious ACORN recording); Associated Press,

acknowledges that he relies on deception to obtain video footage, raising obvious concerns about the veracity of the videos.

61. In 2010, O'Keefe founded Project Veritas, where he continued to produce and publish his distorted hidden camera content under the organization's brand until his ouster in February 2023. The donor-funded organization's board of directors fired him in 2023, reportedly due to "financial malfeasance," including spending hundreds of thousands of dollars of the organization's funds on personal luxuries.[10]

62. The disgraced media provocateur subsequently founded his current organization, O'Keefe Media Group ("OMG"). Upon information and belief, O'Keefe Media Group—like Project Veritas before it—produces deceptive, salacious, and substantially vacuous video content featuring footage of undercover "investigations" purporting to expose perceived enemies of O'Keefe's political agenda for various kinds of wrongdoing. O'Keefe and OMG produced and published the videos that SBA identified as its sole substantive "evidence" in support of its suspension of ATI, the affiliates, and the Individual Plaintiffs.

## **BACKGROUND**

### **I. SBA's 8(a) Program**

63. Congress enacted the program now known as the SBA's 8(a) Business Development Program (the "8(a) program") on a bipartisan basis in 1978 as part of the Small

---

*Project Veritas Admits There Was No Evidence of Election Fraud at Pennsylvania Post Office in 2020*, AP NEWS (Feb. 6, 2024), https://apnews.com/article/election-pennsylvania-postmaster-ballots-2020-project-veritas-327d470d18ec40792ffe4ead61feeb92 (last visited Oct. 18, 2026) (reporting settlement of Erie Postmaster Robert Weisenbach's defamation suit against O'Keefe and Project Veritas arising from their 2020 election-fraud videos).

[10] Associated Press, *Project Veritas Founder James O'Keefe Out at Right-Wing Org*, AP NEWS (Feb. 20, 2023), https://apnews.com/article/workplace-culture-florida-james-okeefe-business-1df6176308a14577ce9ba603fd227237 (last visited Oct. 18, 2026).

Business Act. The program emerged as a product of the civil rights era. It aimed to promote business opportunities for socially and economically disadvantaged individuals and groups, including Native American tribes, and Alaska Native Corporations and Hawaiian Native Organizations.

64. The assistance was warranted. In 1969, nearly 40% of American Indian families lived below the poverty line.[11] Today, American Indians remain among the most poverty-stricken groups measured by U.S. census data—as of 2023, over 20% of American Indians still lived in poverty, nearly double the national average rate.[12]

65. The 8(a) program serves its socially and economically disadvantaged population by providing bidding advantages to program participants, including access to competitive bidding for set-aside federal government needs. The 8(a) program is a long-established part of the architecture of federal government contracting.

66. Participation in the 8(a) program, and certification as an 8(a) participant, does not guarantee that a company will obtain government contracts.

67. Different 8(a) eligibility rules apply to different applicants depending on the nature of the applicant's social or economic disadvantage. In order to qualify for participation in the 8(a) program based on ownership by an Indian tribe, among other requirements, a company must demonstrate that it has reasonable prospects for success in competing in the private sector if admitted to the 8(a) program, and that the company is at least 51% owned by a recognized tribe.

---

[11] John Iceland, *Racial and Ethnic Inequality in Poverty and Affluence, 1959–2015*, 38 Population Research & Policy Review 615, 620–21, 624 fig.1 (2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6934366 (last visited Oct. 18, 2026).

[12] Emily A. Shrider, U.S. Census Bureau, *Current Population Reports, P60-283, Poverty in the United States: 2023*, at 5–6 (2024), available at https://www2.census.gov/library/publications/2024/demo/p60-283.pdf (last visited Oct. 18, 2026).

*See* 13 C.F.R. § 124.109.

## II. The Susanville Indian Rancheria

68. The Susanville Indian Rancheria was established as a political entity in 1923 and later chartered under the authority of the Indian Reorganization Act of 1934, gaining approval from the Secretary of the Interior in 1969. Though a single political entity, the Tribe is comprised of people descended from members of (primarily) four different anthropological tribes: the Maidu, Paiute, Pit River, and Washoe tribes. The Tribe counts approximately 1,500 members, and its lands extend across nearly 1,700 acres in Lassen and Plumas counties in Northern California.

69. The Tribe is governed by a General Council. The General Council is composed of all of the Tribe's adult members.

70. The General Council delegates the responsibilities of running the day-to-day business of the Tribe to a Tribal Business Council. The Tribal Business Council is comprised of seven Tribe members elected by the General Council.

71. Since its founding, the Tribe has grappled with severe financial hardship, widespread poverty, housing shortages, and insufficient water supply. Tribe members have long lacked access to adequate financial, educational, and developmental resources.

72. The Tribal Business Council administers a variety of programs to improve the quality of life for Tribe members and to relieve financial hardship. Among the programs administered by the Tribal Business Council are reimbursement and cash assistance programs available to young and elderly Tribe members, and to other Tribe members dealing with burdensome medical expenses. The Tribal Business Council also administers scholarship programs, job placement and training, and other targeted programs to improve the quality of life for members of the Tribe.

73. To facilitate these efforts to improve the wellbeing of the Tribe's membership, beginning in or around 2004, the Tribal Business Council developed a Master Plan, which aimed to address the core challenges that the Tribe faced: the utilization of its land, the acquisition of additional land, economic and infrastructural development, the ongoing housing shortage, persistent environmental concerns, and the physical, economic, and social wellbeing of its members.

74. As part of the Master Plan, the Tribal Business Council aimed to generate revenue by establishing a variety of for-profit businesses. Several of these companies serve as federal government contractors and subcontractors. The companies are wholly- or majority-owned by the Tribe, generate revenue that supports the Tribe's needs, contribute to the on-the-ground development of the Tribe and its lands, and provide a vehicle for upward mobility to Tribe members who gained employment in the Tribe's companies.

75. Between 2009 and 2011, the Tribe formed three wholly-owned tribal holding companies to operate its for-profit businesses: the Susanville Indian Rancheria Corporation ("SIRCO"); SIRCO Development Holdings d/b/a Four Tribes Development Holdings ("Four Tribes"), and SFSI.

76. SFSI is 100% owned by the Tribe and operates under a Board of Directors, which in turn reports to the Tribal Business Council. All SFSI Board members are enrolled members of the Susanville Indian Rancheria tribe. SFSI manages the Tribe's current non-construction federal contracting services businesses through three direct subsidiaries: SIRCOMed LLC, Plaintiff SFS Global, and Plaintiff ATI.

77. ATI—originally called "Exigent Solutions, LLC"—was established in 2011 as an SFSI subsidiary. The company adopted the name ATI Government Solutions, LLC as part of a

reorganization in August 2017, and remains an SFSI subsidiary.

78. ATI is an LLC with two members: SFSI, which owns a controlling 51% stake in the company, and Transformation Partners, LLC ("TPL"), which owns a 49% minority stake in the company. Under ATI's SBA-approved Operating Agreement, SFSI has, at all times since ATI's inception, held an unconditional controlling, majority voting and equity stake in the company, leaving SFSI with the final say in the company's direction and operation. The management of ATI is ultimately controlled by the Tribe.

79. Commensurate with its ownership interest, 51% of ATI's profit (less reserves) flows to SFSI. SFSI then, at its Board's discretion, either reinvests the profit into the Tribe's for-profit businesses or distributes it back to the Tribe for use by the Tribal Business Council. Among other things, these funds ultimately help fund the anti-poverty, educational, job training, and developmental programs that serve the Tribe.

## III. ATI's 8(a) Application

80. In or around 2018, ATI applied to participate in the SBA's 8(a) program. The application was submitted by SFSI's then-CEO, Dr. Bruce Borup.

81. As part of its application, ATI shared the Tribe's strategic plan for the development of tribal opportunities at ATI (the "Tribal Management Development Plan," or the "Development Plan").

82. The Development Plan acknowledged a mismatch between the expected business needs of the companies that the Tribe sought to establish and the then-existing shortage of needed expertise and management experience among the Tribe's population.

83. The Development Plan established a detailed, multifaceted plan to hire subject-matter experts from outside the Tribe to assist with and lead the modernization and development

of SFSI and its subsidiaries, while prioritizing opportunities for members of the Tribe.

84. The Development Plan thus sets out a plan to develop the leadership of each Tribe-owned business, including ATI, to "afford the opportunity of Tribal members the necessary on-the-job training to assist them in qualifying for management positions" in the future, including by leveraging the Tribe's existing "policy of educational incentive and assistance."

85. Meanwhile, SFSI struggled financially under its prior leadership, operated at a loss month-over-month, and accumulated substantial debt.

86. In early 2019, Dr. Borup resigned as CEO and Crutchfield was appointed as CEO.

87. On February 15, 2019, the SBA blessed the Tribal Management Development Plan and approved ATI's 8(a) certification.

88. Until SBA's unlawful suspension, ATI had been the kind of success story Congress envisioned for the 8(a) program. Following SBA's certification of ATI as an 8(a) program participant, ATI and the SFSI subsidiaries began to turn around financially under the leadership of Crutchfield and Mulyayeva (who had been employed by ATI since 2017). Crutchfield and Mulyayeva assisted SFSI in rebuilding and coming out of debt by renegotiating existing contracts, bidding on new contracts, personally guaranteeing lines of credit, and personally loaning money on several occasions for SFSI and its subsidiaries to make payroll. Deutschman joined ATI in January 2022 and assisted in the recovery efforts. From 2019 through 2022, ATI was essentially a break-even company.

89. From 2023-2025, ATI grew rapidly. It reported $229.4 million in gross revenue from federal contracts across 2019-2025, substantially from the last three years of that period, and grew to 67 employees—almost all of whom have since been terminated after ATI's contracts were cancelled due to the suspension.

90. ATI has served as a reliable and responsible contractor, successfully performing dozens of contracts as either a prime contractor or as part of a joint venture for various agencies, departments, and government customers, including the General Services Administration, the Department of Treasury, the Department of Energy, the Navy, the Department of Labor, the Department of Agriculture, the Department of Health and Human Services, and the Department of State.

91. Meanwhile, consistent with the Development Plan, ATI and SFSI's leadership launched a multi-phase strategic plan to drive growth, professional development, and business maturity for the Tribe. As part of that plan, SFSI established a number of additional tribally-owned and tribally-managed entities to perform government contracting work in different sectors, enhancing opportunities for the Tribe and its members. These include Plaintiffs SF Design, SF Network, SF Transformation, and SF Consulting, which were specifically founded as part of the SFSI Board's plan to create tribal financial autonomy by providing leadership, training, mentorship, and employment opportunities for tribal members.

92. Understanding the importance of the 8(a) program to tribally-owned organizations, and further to their commitment to ensuring ATI operates as a responsible, transparent, trustworthy, and successful government contractor, the Individual Plaintiffs have been vigilant in ensuring ATI's compliance with SBA's regulations for the small business programs in which it operates (including specifically the 8(a) program) and with the requirements of its federal contracts, and have simultaneously prioritized the delivery of exceptional work.

93. Unsurprisingly, then, ATI's contracting partners in the government routinely offered glowing reviews of ATI's trustworthiness and quality of work.

94. Contracting officers have described ATI as "professional, timely, and regularly

display[ing] a level of openness which is becoming increasingly difficult to find among businesses doing business with the government"; they have noted that "ATI's leadership and frontline staff have proven to be of exemplary character and moral fiber"; they have observed that it is "rare to find a contractor who is as skilled and trustworthy as ATI"; and they referred to ATI as a "valuable" "partner[,]" whose "quality of work, ability to exceed expectations, willingness to communicate, internal cost control measures, and honesty are not often found in the government contractor community." One contracting officer said that ATI identified $12.8 million in cost savings for the government, an amount that alone paid for ATI's contract almost three times over, a true measure of Government efficiency.

## IV. The Deceptive Videos

95. At some point in or around 2025, ATI's success as a government contractor and its status as an 8(a) participant drew O'Keefe's attention.

96. O'Keefe created a fake company to catfish a low-level ATI employee who separately ran a catering company into meeting him for lunch by posing as a potential corporate catering customer.

97. During her short tenure, the employee's responsibilities with ATI involved little more than data entry and organizing electronic files related to ATI's government contracts.

98. In keeping with his modus operandi, O'Keefe used hidden cameras to record his conversation with the employee. He baited the employee into making comments to purportedly support his own false, misleading, or deceptive statements about government contracting in general and the 8(a) program in particular. The known propagandist then produced a salacious (but utterly unbelievable) supercut-style video in which he spliced together individual moments of the conversation—often no more than a couple of seconds long—and interwove the clips with his own

defamatory commentary about ATI and 8(a) program participants generally. The video falsely portrayed the employee as having claimed that ATI acted as a pass-through[13] on its 8(a) federal contracts, allowing large businesses to gain access to small business contracts they were not eligible to receive. Through a combination of leading questions, baiting, deceptive editing, cherry-picking, and logical fallacy, he built a narrative on a flimsy foundation, without factchecking, and without ever seeking comment or confirmation from ATI or even corroborating evidence from the victim.

99. O'Keefe released the video to his YouTube channel and posted about the video on X on October 20, 2025.

100. Since the initial video, O'Keefe and OMG have launched several similar (and likewise deceptive) videos, continuing to amplify the unambiguously false narrative that ATI is defrauding the federal government.

## V. The FAR Suspension

101. Though obviously untrue, the videos on their own would not give rise to Plaintiffs' action against the SBA.

102. Plaintiffs' claims hinge instead on SBA's, its leadership's, and its employees' reckless reliance on vacuous internet content as its sole basis for suspending Plaintiffs, which led to the termination of millions of dollars in ATI's government contracts, and halting their (and their executives') future contracting opportunities, all contrary to law.

103. Within hours of the video's launch—and without any factual basis whatsoever—Defendant Loeffler posted to the social media site X that "SBA has launched an investigation into

---

[13] A "pass-through" scheme occurs when a prime contractor wins a government contract but subcontracts out all or nearly all of the work for the contract to a subcontractor, adding no real value to the contract performance and inflating costs for projects.

ATI Government Solutions and Susanville Indian Rancheria," continuing that "This is why we have been conducting a full review of the 8(a) program. . . . [W]hat we've discovered so far has been institutionalized abuse, which potentially amounts to billions of dollars in federal contracts[.]"

104. The next day, the SBA issued the FAR Suspension Notice to ATI and Plaintiffs Crutchfield, Mulyayeva, and Deutschman, invoking FAR 9.407 (the "FAR Suspension").

105. During the time between the publication of the video and its issuance of the FAR Suspension, SBA requested no documents from any of the Plaintiffs.

106. During the time between the publication of the video and its issuance of the FAR Suspension, SBA requested no interviews from any of the Plaintiffs or their personnel.

107. During the time between the publication of the video and its issuance of the FAR Suspension, SBA never attempted to contact any of the Plaintiffs in this action or their affiliated personnel.

108. SBA employee Edmund Bender transmitted the FAR Suspension Notice by email to Plaintiff Crutchfield and the chair of the SIR Tribal Business Council. At the time he transmitted the Suspension Notice, Bender was furloughed from the SBA due to a government shutdown and forbidden from performing non-essential government work under the Anti-Deficiency Act, 31 U.S.C. §§ 1341–1342, 1349.

109. Following ATI's receipt of the FAR Suspension Notice, attorneys for ATI and the Individual Plaintiffs promptly requested an emergency conference with SBA's suspension and debarment official, John Klein, and Bender. ATI's counsel received an out-of-office response from Bender stating that "I am on furlough due to the lapse in appropriations. Therefore, I am not allowed to access my e-mail during this period." ATI received no response from Klein and no

other response from SBA to its request.

110. On or around October 21, 2025, on information and belief, an (as-yet unidentified) SBA employee leaked the FAR Suspension Notice to O'Keefe with the knowledge and/or intent that it would be published for public consumption.

111. O'Keefe promptly posted the FAR Suspension Notice on his YouTube platform and took credit for the suspension.

112. Almost immediately thereafter, Plaintiff Crutchfield began receiving death threats. Crutchfield was forced to change his phone number and email address as a result of the threats and harassment he received following publication of the leaked, baseless FAR Suspension Notice.

113. It is well established that the subjects of O'Keefe's hidden camera videos are frequently "doxxed"—their names, addresses, and contact information released to the public—which can lead to threats and harassment.[14]

[14] Shuhan Wang, *The Escalating Threats of Doxxing and Swatting: An Analysis of Recent Developments and Legal Responses*, NAT'L ASS'N OF ATT'YS GEN. (Aug. 12, 2025), https://www.naag.org/attorney-general-journal/the-escalating-threats-of-doxxing-and-swatting-an-analysis-of-recent-developments-and-legal-responses (last visited Oct. 18, 2026).

114. On October 22, 2025, Defendant Loeffler publicized ATI's FAR Suspension, linking back to her earlier post promoting the false and defamatory video.



Post

Kelly Loeffler
@SBA_Kelly

As of today, the SBA has officially suspended ATI Government Solutions, which is majority-owned by Susanville Indian Rancheria, as well as three of its executives, from conducting any new business with the federal government.

While we continue our investigation, ATI and its referenced executives will not be permitted to bid for federal contracts, subcontracts, or set-asides, and will not be able to receive any federal assistance.

We have been in contact with the Department of Justice and will continue to provide updates as they become available.

As a reminder, whistleblowers with any information about these companies - or any suspected contracting abuse - may submit a tip at: sbax.sba.gov/oigcss/.

Kelly Loeffler @SBA_Kelly · Oct 20, 2025
SBA has launched an investigation into ATI Government Solutions and Susanville Indian Rancheria.

This is why we have been conducting a full review of the 8(a) Program, ostensibly designed to help "socially and economically disadvantaged" small...

11:47 AM · Oct 22, 2025 · 1.4M Views

## VI. Subsequent Suspensions

115. On October 23, 2025, the SBA informed ATI that it was issuing a second suspension against ATI, this one suspending ATI from participation in the 8(a) program (the "8(a) Suspension Notice").

116. The bases identified for the 8(a) Suspension Notice were identical to the bases identified in the FAR Suspension Notice.

117. On November 7, 2025, SBA issued additional FAR suspension notices to SF Consulting, SF Design, SF Network, SF Transformation, SFS–GT, and SFS Global, all premised purely on the companies' affiliation with Crutchfield and/or ATI.

118. Administrator Loeffler published the suspensions to social media, falsely

portraying Crutchfield as the leader of a multi-company conspiracy to defraud the Government.

## VII. The Administrative Record Underlying the Suspensions

119. On November 6, 2025, ATI's counsel requested that the SBA provide a copy of the administrative record underlying ATI's suspension, including proof of authenticity of, and the metadata associated with, any external evidence used to justify the suspension.

120. The SBA provided the administrative record via email on November 19, 2025, just one day prior to the due date for ATI's response to the FAR Suspension Notice.

121. The email transmitting the administrative record is reproduced in its entirety (excluding attachments) below:

| | |
|---|---|
| **From:** | Bender, Edmund <Edmund.Bender@sba.gov> |
| **Sent:** | Wednesday, November 19, 2025 4:17 PM |
| **To:** | Matt Feinberg |
| **Cc:** | Klein, John W. |
| **Subject:** | [EXTERNAL EMAIL] Administrative record - ATI Government Solutions LLC |
| **Attachments:** | LEXIS_ati_government_solutions.pdf; SAM Record ATI Government Solutions.pdf |

Dear Matt,

As requested, please find the administrative record for the Notice of Suspension issued to ATI Government Solutions LLC on October 21, 2025. In addition to the attached documents, SBA's suspension is based on the following videos produced by the O'Keefe Media Group:

1. "Pass-Throughs", "Shell-Companies", & $100 Billion Federal Contracting Scam | O'Keefe Media Group
2. BREAKING: ANOTHER Federal Contractor Admits to $100M Fraud & Outsourcing to Accenture
3. CONFRONTING Former ATI Employee Who Exposed MILLIONS in Government Contract Fraud

Regards,
Ed

122. The first of the videos linked in Bender's email is described *supra* at Paragraphs 95–99.

123. The second and third videos linked in Bender's email are also produced by OMG. The second video was published on October 22, 2025—the day *after* ATI received its FAR Suspension Notice. Likewise, the third video was published on October 23, 2025—another day later.

124. Along with these three videos—two of which cannot possibly have been considered in issuing the suspension because they were not yet published—the "administrative record" attached to Bender's email entailed two documents spanning sixteen pages. A true and correct copy of the full Administrative Record provided by the SBA is attached hereto as Exhibit A.

125. Neither document included in the Administrative Record was remotely incriminating, or even relevant to allegations that could give rise to a legitimate suspension or debarment proceeding.

126. The first document is a LexisNexis SmartLinx Comprehensive Business Report, spanning 9 pages, that lists ATI's corporate registration information and the identities of its officers. The document contains no negative information about ATI or its officers.

127. The second document is a similarly innocuous SAM.gov "Core Data" printout reflecting the government contracts that ATI obtained. The document contains no negative information about ATI or its officers; indeed, it is merely a publicly available list of ATI's government contracts.

128. Aside from Bender's email linking the three selectively-edited and obviously incredible videos, the LexisNexis SmartLinx Comprehensive Business Report, and the SAM.gov webpage PDF, there were no additional documents identified as part of the administrative record in Bender's email to ATI's counsel.

129. The law is clear: SBA may issue a FAR Suspension only on the basis of adequate evidence and cannot simply suspend companies on a whim.

130. Indeed, it has been the law for more than 50 years that uncorroborated suspicion and accusation, even purported admissions by a company executive, do not constitute "adequate evidence" sufficient to support a FAR suspension. *Horne Bros., Inc. v. Laird*, 463 F.2d 1268, 1271

(D.C. Cir. 1972); *Sloan v. Dep't of Hous. & Urban Dev.*, 231 F.3d 10, 16 (D.C. Cir. 2000) (same); *cf. Matter of ATI Gov't Sols., LLC*, SBA No. BDP-728, 2026 WL 1459511, at *13 (2026) (Even "[c]onclusory statements by a firm's principal which raise suspicions do not amount to adequate evidence" to suspend a contractor from the 8(a) program) (citing *Matter of Alliance Steel Constr., Inc.*, SBA No. BDP-186, 2002 WL 32988164, at *8–9 (2002)). Nor does animus or disfavor towards a company.

131. The FAR 9.407 Administrative Record is required to include all documents that the agency considered in rendering its decision to suspend a contractor.

132. All of the materials that SBA relied upon in determining that there was "adequate evidence" to issue the FAR Suspension Notice suspending ATI on October 21, 2025 are contained within the Administrative Record transmitted on November 19, 2025. SBA has not amended, supplemented, or otherwise updated its Administrative Record since November 19, 2025.

133. Neither the LexisNexis SmartLinx Comprehensive Business Report nor the SAM.gov webpage PDF contain independent evidence of wrongdoing by ATI that would justify ATI's October 21, 2025 FAR Suspension.

134. A YouTube video featuring plainly edited hidden camera footage of a low-level, short-term employee making otherwise-unsupported statements about a company's operations does not constitute "adequate evidence" to justify a suspension.

135. The October 21, 2025 FAR Suspension of ATI was not justified by adequate evidence.

## VIII. Subsequent Events

136. Within 30 days of the FAR Suspension, ATI provided the SBA with affirmative evidence that the allegations in the videos (including the two videos that post-date the FAR

Suspension itself) were patently and demonstrably false.

137. In particular, the FAR Suspension Notice listed supposed "Admissions" from ATI's Contracts Manager—*i.e.*, the title held by the low-level employee featured in the first video—as the bases for ATI's suspension. The purported "Admissions," as characterized by the SBA, are as follows:

> 1. The Susanville Indian Rancheria tribe does not in effect control ATI and the tribe knowingly ceded control to three nondisadvantaged individuals in ATI's executive team, specifically Mr. Crutchfield, Mr. Deutschman, and Ms. Mulyayeva;
> 2. ATI uses its 8(a) status to act as a "pass-through" for other businesses that would otherwise be ineligible for 8(a) awards;
> 3. ATI routinely does not meet the limitations on subcontracting requirements on its 8(a) contracts;
> 4. The tribe does not proportionally benefit from ATI's 8(a) contracts. Rather the tribe receives a percentage that is smaller than its ownership interest, and the remaining benefit goes to the nondisadvantaged management team.

138. Each of the purported "Admissions" is demonstrably false.

139. At all times, the Tribe has retained actual, effective, and legal control over ATI. Because ATI is majority-owned by SFSI (which in turn is wholly owned by the Tribe), ATI's executives, the Individual Plaintiffs, served at the pleasure of the SFSI Board of Directors. On several occasions, ATI's executives made requests or recommendations to the SFSI Board of Directors that the Board rejected; because the SFSI Board ultimately controlled ATI, when the Board disagreed with the executives' proposed courses of action, the Board's decision carried the day.

140. In support of ATI's response to the FAR Suspension Notice, Plaintiff Crutchfield provided SBA with a sworn affidavit listing eight examples of instances in which the SFSI Board exercised its control over ATI to overrule a request or recommendation he made to the Board.

141. At no point has ATI operated as an unlawful "pass-through." Prior to its suspension,

ATI was a functioning, operational business, majority owned by the Tribe, with 67 employees working to fulfill the needs of its contracting partners in the federal government.

142. ATI enters every government contract with the intent, expectation, and plan to satisfy all of the 8(a) program's compliance obligations, including those involving limitations on subcontracting.[15] Compliance with the limitations on subcontracting requirements is calculated either at the end of the Base Period and each Option Period of a contract or at the end of a contract's period of performance, depending on the type of contract in question. 13 C.F.R. § 125.6 ("The period of time used to determine compliance for a total or partial set-aside contract will generally be the base term and then each subsequent option period. However, for a multi-agency set aside contract where more than one agency can issue orders under the contract, the ordering agency must use the period of performance for each order to determine compliance and monitor compliance with the limitations on subcontracting for that specific order.").

143. ATI met the limitations on subcontracting and other performance of work requirements for each full Base Period, Option Period, or period of performance on its contracts, in compliance with 13 C.F.R. § 125.6. There were only four discrete instances out of 57 total performance periods where ATI fell slightly below the compliance threshold during a partial Base Year or partial Option Year, but each of those instances was the result of an early contract termination by the Government (either as a result of cuts by the Department of Government Efficiency or terminations for convenience arising out of the FAR Suspension). None of these instances represents a violation of the limitations on subcontracting requirements, because each

[15] The "limitations on subcontracting" rules are SBA regulations that prohibit prime contractors on set-aside contracts, including contracts under the 8(a) program, from subcontracting more than 50% of the amount paid by the Government to entities that are not similarly situated to the prime contractor. 13 C.F.R. § 125.6.

contract was terminated before the end of such Base Period or Option Period. *Id.* (limitations on subcontracting compliance is not calculated on a partial performance period basis, but rather across each base period and each option period). Even in these four select instances, if ATI's contracts had not been terminated, it would have met the subcontracting limitation threshold over the life of the contract and with the Government's full knowledge of its performance of work schedule.

144. At all relevant times, the Tribe's wholly owned tribal holding company, SFSI, retained a 51% ownership stake in ATI, and benefitted proportionally. ATI's current Operating Agreement, which was approved by SBA and has been in place at all times relevant hereto, confirms that "All Profits and Losses shall be allocated to each Member based upon each Member's Percentage Interest." And as ATI's counsel has repeatedly explained to SBA—including by providing financial documents from ATI, SFSI, and TPL—ATI's actual income distributions are consistent with the Operating Agreement.

145. Despite the baselessness of SBA's initial suspension decision, Plaintiffs have attempted for a year to resolve SBA's concerns by demonstrating beyond any doubt that the claims made in O'Keefe's videos are disconnected from reality. To that end, Plaintiffs have provided over 12,500 pages of documents and information supporting their present responsibility and refuting SBA's suspension bases and have pursued every available opportunity to meet with SBA personnel to answer any questions SBA officials might have.

146. To date, SBA has not provided any evidence to corroborate the claims made in the videos that underlie its actions.

147. To the contrary, SBA and Defendant Loeffler have continued to publicly defame ATI and the Individual Plaintiffs and have used ATI as a scapegoat justifying a broader attack on SBA's Congressionally-mandated 8(a) program.

148. On December 4, 2025, in a meeting between SBA officials (including SBA's suspension and debarment official) and Plaintiffs' counsel, SBA's suspension and debarment official, in the presence of the SBA's then-General Counsel and then-Deputy General Counsel, admitted that some of the allegations in the videos were facially unbelievable. Specifically, the suspension and debarment official admitted that an allegation in one of the videos—that a large business performed the vast majority of the work on a $100 million contract awarded to ATI but received only 35% of the contract funds—was not credible, because no business would willingly accept $35 million in pay for tens of millions of dollars more than that in work.

149. Despite their awareness of the absurdity of the videos' claims, Defendants still publicly hew to them. On December 5, 2025, Defendant Loeffler announced the launch of a full program-wide audit of the 8(a) Business Development program, citing ATI's suspension as an example of the SBA's anti-fraud efforts.

> Administrator Loeffler ordered a full-scale audit of the 8(a) Program earlier this year after a DOJ investigation uncovered a $550 million fraud and bribery scheme involving a former federal contracting officer and two 8(a) contractors. The audit, which is ongoing, focuses on examining high-dollar and limited-competition contracts going back over a period of fifteen years in collaboration with various federal agencies that award contracts to 8(a) participants. Last month, SBA took immediate action to suspend numerous executives and contractors following allegations of fraud involving more than $253 million in previously issued contract awards.

150. The link included in the press release was to Defendant Loeffler's October 21, 2025 post to X about ATI's suspension.

## IX. <u>The 8(a) Suspension Appeal</u>

151. On December 8, 2025, ATI appealed its 8(a) Suspension to SBA's Office of Hearings and Appeals (the "OHA Proceeding"), an internal SBA tribunal.

152. Despite SBA's obligation to produce an Administrative Record in the OHA proceeding that included "every document relevant to [ATI's] termination that the SBA possessed

on the date of its determination, and upon which the decision-maker and those SBA officials who recommended for or against the determination relied[,]" the OHA Administrative Record contained one document: the FAR Suspension Notice.

153. On May 18, 2026, an Administrative Law Judge at OHA issued an Order remanding the 8(a) Suspension Proceeding to SBA to supplement the OHA Administrative Record (the "OHA Decision").

154. The OHA Decision held that SBA had misrepresented the basis for the suspension during the OHA Proceedings, and that the true stated bases for the suspension had been the alleged "statements made by [ATI's] employee[.]" It further held that SBA "ma[de] no effort whatever to substantiate [those statements] . . . ." The OHA Decision cautioned SBA that "uncorroborated suspicion or accusation" and "[c]onclusory statements" by a contractor's principal or employee "which raise suspicions" about improper conduct "do not amount to adequate evidence" sufficient to suspend a contractor.

155. The OHA Decision gave SBA until June 12, 2026 to supplement the OHA Administrative Record.

156. On June 4, 2026, SBA lifted ATI's 8(a) Suspension, commenting that the SBA "has completed a thorough review of the information . . . provided regarding ATI Government Solutions LLC's . . . suspension from the 8(a) [program] . . . and has lifted the 8(a) suspension." The SBA continued: "SBA conducted a review of the information provided in the ATI submissions and determined that suspension was no longer necessary."

157. Four days later, ATI's counsel requested that the SBA similarly lift the FAR 9.407 Suspension. SBA refused.

158. On July 23, 2026, Plaintiffs' counsel met with seven SBA officials: then-SBA

General Counsel, Wendell Davis; then-SBA Deputy General Counsel Jennifer Prescott; SBA Deputy General Counsel and Suspension and Debarment Official John Klein; Attorney Edmund Bender; Associate General Counsel for Litigation Eric Benderson; Attorney Lane Siems; and Attorney Denise Grugan, at SBA headquarters for a meeting regarding the ongoing suspension. At the meeting, Plaintiffs' counsel repeatedly requested that these SBA officials provide any facts, evidence, events, or areas of concern regarding Plaintiffs that would justify an ongoing suspension. None of these seven SBA officials, some of whom had been involved in the suspension proceeding since the day the FAR Suspension Notice issued, were able to provide any examples or identify any areas of concern.

159. The same day, SBA Attorney Eric Benderson wrote Plaintiffs' counsel and stated: "We found our discussion . . . helpful in our review of the suspension. We will have a decision in the matter August 5, 2026, at the latest."

160. But SBA missed that self-imposed deadline. On August 5, 2026, Benderson stated that SBA was "not able to finish [its] review . . . but expect[ed] to complete [the] review tomorrow[,]" *i.e.*, August 6, 2026.

161. SBA missed its self-imposed August 6, 2026 deadline as well. In an email that day, Benderson stated that he was "told that [SBA] won't have a response until Tuesday[,]" *i.e.*, August 11, 2026.

162. On August 7, 2026, Plaintiffs' counsel spoke with Benderson by phone. Benderson implied that there were career SBA employees who believed the suspension should be lifted. However, Benderson stated that "someone else" had gotten involved at SBA which prevented SBA from providing a decision. Based on Benderson's other comments on the call, on information and belief, the "someone else" who had gotten involved to block the lifting of the suspensions is

Defendant Loeffler's Chief of Staff Wesley Coopersmith, a political appointee with no known experience in suspension and debarment matters, the 8(a) Program, or federal government contracting.

163. SBA missed its August 11, 2026 self-imposed deadline as well, this time without providing a new deadline.

164. Ten days later, on August 21, 2026, in a transparent effort to delay proceedings further, SBA issued another lengthy and broad request for documents to ATI. The document requests were irrelevant to the bases for suspension SBA had previously articulated in the FAR Suspension Notice, extremely broad and onerous in some respects, and in other respects sought information already provided by Plaintiffs multiple times.

165. Plaintiffs' counsel informed the SBA that, given the volume of SBA's requests made ten months after the suspension, it would take weeks, if not months, for Plaintiffs to provide the responsive documents.

166. Nevertheless, on October 1, 2026, Plaintiffs provided a thorough response, providing ample evidence demonstrating Plaintiffs' present responsibility and compliance with 8(a) program requirements.

167. At 12:00 a.m. on October 21, 2026, a full year had passed since SBA issued the FAR Suspension Notice to ATI and the Individual Plaintiffs, and SBA was required to lift the suspension as a result.

168. The SBA has still not lifted the FAR Suspension against ATI.

169. The SBA has still not lifted the FAR Suspension against the Individual Plaintiffs.

170. The SBA has still not lifted the FAR suspensions against SFSI's affiliates.

171. Instead, on information and belief, SBA officials have reached out to one or more

Department of Justice officials in bad faith to encourage those officials to request an extension of the suspension.

172. There is no factual or legal basis for such a request.

173. On October 21, 2026, SBA informed Plaintiffs that the FAR Suspension against Plaintiffs would be extended for an additional six months, citing FAR 9.407-4(b).

174. FAR 9.407-4(b) permits a six-month extension of a suspension where "an office of a U.S. Assistant Attorney General, U.S. Attorney, or other responsible prosecuting official requests its extension, in which case it may be extended for an additional 6 months."

175. On information and belief, the Department of Justice capitulated to SBA's baseless request, and any "investigation" into ATI was initiated for the purpose of obtaining an extension of the suspension period. The extension is arbitrary and capricious, contrary to law, and a brazen violation of Plaintiffs' constitutional rights.

176. The ultimate result has been that, despite the passage of a full year since the suspensions and the FAR's mandate that the suspensions be lifted, SBA has maintained the suspensions contrary to law.

177. The FAR suspensions effectively prevent the Plaintiffs from engaging in business, and, like the 8(a) Suspension, are entirely unconnected to any supporting evidence or factual basis.

## X. Impacts of SBA Suspensions and Failure to Engage in Good Faith

178. The SBA's suspensions have been devastating to Plaintiffs and to the Tribe.

179. The FAR suspensions, together with the Defendants' refusal to engage in good faith with Plaintiffs' efforts to obtain relief from the suspensions, have resulted in the termination of contracts worth nearly $130 million previously awarded to ATI and its affiliates.

180. The FAR suspensions, together with the Defendants' refusal to engage in good faith

with Plaintiffs' efforts to obtain relief from the suspensions, have resulted in the loss of over $500 million in prospective new business for ATI and its affiliates.

181. The FAR suspensions, together with the Defendants' refusal to engage in good faith with Plaintiffs' efforts to obtain relief from the suspensions, prevent Plaintiffs from obtaining future government contracts.

182. The FAR suspensions, together with Defendants' refusal to engage in good faith with Plaintiffs' efforts to obtain relief from the suspensions, and with Defendant Loeffler's public statements denigrating the integrity of ATI and its affiliated companies and persons, severely impair Plaintiffs' professional reputations, impeding their ability to obtain governmental or non-governmental contracts, and compromising the Individual Plaintiffs' ability to obtain gainful future employment. The effective halt in economic activity for the Tribe's businesses that has occurred as a result of the SBA's suspensions has destroyed an important revenue stream for the Tribe, and critically compromises its long-term fiscal prospects.

183. Defendant Loeffler and her staff at the SBA know that videos like those used here are unserious, unsubstantiated clickbait, and not the basis for the official actions of a government agency whose obligation, above all else, is to follow the law.

184. Defendant Loeffler and her staff at the SBA have a duty to ensure that any action the SBA takes is informed by adequate evidence.

185. Defendant Loeffler's and SBA's failure to compile even a pro forma administrative record demonstrates the carelessness with which they blindly adopted a baseless narrative, and reflects their indifference to the legal standards that govern agency activities.

## CAUSES OF ACTION

186. The APA provides that "[a] person suffering legal wrong because of agency action,

or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

187. The APA provides that "final agency action for which there is no other adequate remedy in a court" is "subject to judicial review." 5 U.S.C. § 704.

188. The APA provides that courts will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E).

189. SBA is an "agency" whose final actions are reviewable under the APA.

**COUNT I – ADMINISTRATIVE PROCEDURE ACT**
**ARBITRARY AND CAPRICIOUS AGENCY ACTION**

190. Plaintiffs incorporate by reference Paragraphs 1 through 189 of this Complaint as if fully set forth and restated herein.

191. The Administrative Procedure Act "requires courts to hold unlawful and set aside agency action, findings, and conclusions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. . . . An agency is required to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Remmie v. Mabus*, 898 F. Supp. 2d 108, 115 (D.D.C. 2012) (citation modified).

192. Further, agency action is arbitrary and capricious if the agency relied on factors which Congress or the Government has not intended it to consider; entirely failed to consider important aspects of a problem or ignores evidence contradicting its position; offered an explanation for its decision that runs counter to evidence before the agency; or is so implausible that it could not be ascribed to a difference in view or product of agency expertise, such as where the agency utilizes illogical reasoning or bases its decision on information that harbors indicia of

unreliability.

193. Agency action is also arbitrary and capricious where the agency engages in disparate treatment by treating persons or companies differently under the same or similar circumstances, or fails to consider reasonable alternatives.

194. SBA's issuance of suspension notices to Plaintiffs, including the FAR Suspension Notice to ATI and the Individual Plaintiffs and the suspension notices to SFSI's affiliates, and its continued suspension of Plaintiffs after Plaintiffs provided substantial evidence and responses to SBA's inquiries, are arbitrary and capricious agency actions because, *inter alia*:

a. The suspension notices rely entirely on conclusory statements and fail to provide any statement of facts found or reasoned analysis justifying the choices made;

b. The suspension is based on a bare administrative record which contains no reliable, credible evidence on which to base a suspension, and which was evidently constructed as a *post hoc* rationalization for the agency's action in light of the inclusion of two as-yet unpublished videos as part of the basis for the suspension;

c. SBA did not consider all relevant factors in rendering the suspension decisions, including but not limited to that: it is well known, including by SBA, that O'Keefe is an unreliable source who fabricates or manipulates statements to further his own political beliefs, rendering any statements he publishes incredible and unbelievable on their face; the factors on which SBA claims it relied to suspend Plaintiffs (conclusory, as noted above) are demonstrably false, untethered to a reliable factual record, and contradicted by substantial evidence, among other factors which SBA failed to consider; and, on information and belief, the recommendations of various SBA employees who stated that Plaintiffs should not be suspended;

d. SBA's suspension decisions rely on uncorroborated allegations of a short-term former employee of ATI that were selectively edited, contrary to well-settled legal principles related to suspension decisions that prohibit SBA from suspending a contractor based on uncorroborated allegations or unsupported suspicions;

e. SBA took no action to verify the facially suspect allegations on which it based its suspension decisions and took no action, performed no investigation, and had no reliable evidence on which to make extremely damaging statements about Plaintiffs;

f. SBA leaked the FAR Suspension Notice to the disgraced source of the original false videos with the intent that he post it for public consumption, contrary to historical practice and for the purpose of drawing even more negative attention to the Parties to bolster SBA's misleading and unsupported narrative;

g. After the suspensions took effect, SBA received substantial evidence from Plaintiffs contradicting the suspension decision, but SBA has still not considered it—instead, it has ignored or disregarded Plaintiffs' evidence without any basis;

h. SBA deviated from its standard practices, procedures, and protocols by suspending Plaintiffs immediately without inquiring of any of Plaintiffs as to their response to the allegations or allowing Plaintiffs to provide evidence to avoid suspension when it has not done so for similarly situated contractors;

i. SBA continued the FAR 9.407 suspension even after a judge from the Office of Hearings and Appeals found that SBA was engaging in *post hoc* rationalizations to attempt to justify the 8(a) Suspension and would need to provide more than the obviously manipulated videos to meet the adequate evidence standard;

j. SBA continues to maintain the 9.407 Suspensions despite being unable, in response to several requests by Plaintiffs' counsel, to identify any facts, events, or areas of concern on which SBA believes a suspension is justified;

k. SBA continues to maintain the 9.407 Suspensions despite the passage of one year, in direct violation of FAR 9.407–4;

l. On information and belief, SBA officials have in bad faith implored the Department of Justice to improperly investigate Plaintiffs, and request an extension of the 9.407 Suspensions without any justification for doing so in order to manufacture justification for its unlawful suspension after the fact; and

m. SBA otherwise acted arbitrarily and capriciously in a manner to be demonstrated by the administrative record.

195. Indeed, SBA's initial decision to suspend Plaintiffs, and its continued suspension of Plaintiffs after receiving Plaintiffs' responses to the suspensions, conflicts with the evidence in the record that establishes Plaintiffs' present responsibility, compliance with applicable regulations, and satisfaction of contract requirements.

196. SBA further erred by treating Plaintiffs disparately from many similarly situated businesses that have not been suspended despite allegations that such businesses violated the performance of work requirements, including the limitations on subcontracting requirements, on their contracts; that someone other than a socially- and economically-disadvantaged individual controlled the company; and that a socially- and economically-disadvantaged individual was not receiving their proper distribution from the company.

197. For each of these reasons, SBA's initial decision to suspend Plaintiffs and continued suspension of Plaintiffs after Plaintiffs submitted their responses to the suspension, are arbitrary

and capricious agency action that should be overturned.

**COUNT II – ADMINISTRATIVE PROCEDURE ACT**
**AGENCY ABUSE OF DISCRETION**

198. Plaintiffs incorporate by reference Paragraphs 1 through 189 of this Complaint as if fully set forth and restated herein.

199. Agency action constitutes an abuse of discretion where it is unreasonable, irrational, or contrary to existing law.

200. Throughout their tenures as government contractors, Plaintiffs have consistently satisfied their contractual and regulatory obligations, and have proven themselves to be responsible, reliable contracting partners for the government agencies with whom they partner.

201. Plaintiffs have never engaged in the misconduct alleged in the videos on which SBA based the suspension decisions.

202. SBA's issuance of suspension notices to Plaintiffs, including the FAR 9.407 Suspension Notice to ATI and the Individual Plaintiffs and the suspension notices to SFSI's affiliates, and its continued suspension of Plaintiffs after Plaintiffs provided substantial evidence and responses to SBA's inquiries, is an abuse of discretion because, *inter alia*:

a. The suspension notices rely entirely on conclusory statements and fail to provide any statement of facts found or reasoned analysis justifying the choices made;

b. The suspension is based on a bare administrative record which contains no reliable, credible evidence on which to base a suspension, and which was evidently constructed as a *post hoc* rationalization for the agency's action in light of the inclusion of two as-yet unpublished videos as part of the basis for the suspension;

c. SBA did not consider all relevant factors in rendering the suspension decisions, including but not limited to that: it is well known, including by SBA, that O'Keefe

is an unreliable source who fabricates or manipulates statements to further his own political beliefs, rendering any statements published by him incredible and unbelievable on their face; the factors on which SBA claims it relied to suspend Plaintiffs (conclusory, as noted above) are demonstrably false, untethered to a reliable factual record, and contradicted by substantial evidence, among other factors which SBA failed to consider; and, on information and belief, the recommendations of various SBA employees who stated that Plaintiffs should not be suspended;

d. SBA's suspension decisions rely on uncorroborated allegations of a short-term former employee of ATI that were selectively edited, contrary to well-settled legal principles related to suspension decisions that prohibit SBA from suspending a contractor based on uncorroborated allegations or unsupported suspicions;

e. SBA took no action to verify the facially suspect allegations on which it based its suspension decisions and took no action, performed no investigation, and had no reliable evidence on which to make extremely damaging statements about Plaintiffs;

f. SBA leaked the FAR Suspension Notice to the disgraced source of the original false videos with the intent that he post it for public consumption, contrary to historical practice and for the purpose of drawing even more negative attention to the Parties to bolster SBA's misleading and unsupported narrative;

g. After the suspensions took effect, SBA received substantial evidence from Plaintiffs contradicting the suspension decision, but SBA has still not considered it—instead, it has ignored or disregarded Plaintiffs' evidence without any basis;

h. SBA deviated from its standard practices, procedures, and protocols by suspending Plaintiffs immediately without inquiring of any of Plaintiffs as to their response to the allegations or allowing Plaintiffs to provide evidence to avoid suspension when it has not done so for similarly situated contractors;

i. SBA continued the FAR 9.407 suspension even after a judge from the Office of Hearings and Appeals found that SBA was engaging in *post hoc* rationalizations to attempt to justify the 8(a) Suspensions and would need to provide more than the O'Keefe videos to meet the adequate evidence standard;

j. SBA continues to maintain the 9.407 Suspensions despite being unable, in response to several requests by Plaintiffs' counsel, to identify any facts, events, or areas of concern on which SBA believes a suspension is justified;

k. SBA continues to maintain the 9.407 Suspensions despite the passage of one year, in direct violation of FAR 9.407–4;

l. On information and belief, SBA officials have in bad faith implored the Department of Justice to improperly investigate ATI, and request an extension of the 9.407 Suspensions without any justification for doing so in order to manufacture justification for its unlawful suspension after the fact; and

m. SBA otherwise abused its discretion in a manner to be demonstrated by the administrative record.

203. Indeed, SBA's initial decision to suspend Plaintiffs, and its continued suspension of Plaintiffs after receiving Plaintiffs' responses to the suspensions, conflicts with the evidence in the record that establishes Plaintiffs' present responsibility, compliance with applicable regulations, and satisfaction of contract requirements.

204. SBA's abuse of discretion is further evidenced by its disparate treatment of Plaintiffs as compared with the many similarly situated businesses that have not been suspended amid allegations that such businesses violated the performance of work requirements, including the limitations on subcontracting requirements, on their contracts; that someone other than a socially- and economically-disadvantaged individual controlled the company; and that a socially- and economically-disadvantaged individual was not receiving their proper distribution from the company.

205. For each of these reasons, SBA's initial decision to suspend Plaintiffs and continued suspension of Plaintiffs after Plaintiffs submitted their responses to the suspension, are abuses of discretion that should be overturned.

## COUNT III – ADMINISTRATIVE PROCEDURE ACT AGENCY ACTION CONTRARY TO LAW

206. Plaintiffs incorporate by reference Paragraphs 1 through 189 of this Complaint as if fully set forth and restated herein.

207. Agency action is contrary to law where it deviates from or is conducted in contravention of the United States Constitution, existing statutes, regulations, agency rules, or judicial or quasi-judicial decisions.

208. Throughout their tenures as government contractors, Plaintiffs have consistently satisfied their contractual and regulatory obligations, and have proven themselves to be responsible, reliable contracting partners for the government agencies with whom they partner.

209. Plaintiffs have never engaged in the misconduct alleged in the clearly edited and misleading videos on which SBA based the suspension decisions.

210. SBA's issuance of suspension notices to Plaintiffs, including the FAR 9.407 Suspension Notice to ATI and the Individual Plaintiffs and the suspension notices to SFSI's

affiliates, and its continued suspension of Plaintiffs after Plaintiffs provided substantial evidence and responses to SBA's inquiries, are contrary to law because, *inter alia*:

a. The suspension notices rely entirely on conclusory statements and fail to provide any statement of facts found or reasoned analysis justifying the choices made;

b. The suspension is based on a bare administrative record which contains no reliable, credible evidence on which to base a suspension, and which was evidently constructed as a *post hoc* rationalization for the agency's action in light of the inclusion of two as-yet unpublished videos as part of the basis for the suspension;

c. SBA did not consider all relevant factors in rendering the suspension decisions, including but not limited to that: it is well known, including by SBA, that the source is an unreliable former convict who fabricates or manipulates statements to further his own political agenda, rendering any statements published by him incredible and unbelievable on their face; the factors on which SBA claims it relied to suspend Plaintiffs (conclusory, as noted above) are demonstrably false, untethered to a reliable factual record, and contradicted by substantial evidence, among other factors which SBA failed to consider; and, on information and belief, the recommendations of various SBA employees who stated that Plaintiffs should not be suspended;

d. SBA's suspension decisions rely on uncorroborated allegations of a short-term former employee of ATI that were selectively edited, contrary to well-settled legal principles related to suspension decisions that prohibit SBA from suspending a contractor based on uncorroborated allegations or unsupported suspicions;

e. SBA took no action to verify the facially suspect allegations on which it based its

suspension decisions and took no action, performed no investigation, and had no reliable evidence on which to make extremely damaging statements about Plaintiffs;

f. SBA leaked the FAR Suspension Notice to the disgraced source of the original false videos with the intent that he post it for public consumption, contrary to historical practice and for the purpose of drawing even more negative attention to the Parties to bolster SBA's misleading and unsupported narrative;

g. After the suspensions took effect, SBA received substantial evidence from Plaintiffs contradicting the suspension decision, but SBA has still not considered it—instead, it has ignored or disregarded Plaintiffs' evidence without any basis;

h. SBA deviated from its standard practices, procedures, and protocols by suspending Plaintiffs immediately without inquiring of any of Plaintiffs as to their response to the allegations or allowing Plaintiffs to provide evidence to avoid suspension when it has not done so for similarly situated contractors;

i. SBA continued the FAR 9.407 suspension even after a judge from the Office of Hearings and Appeals found that SBA was engaging in *post hoc* rationalizations to attempt to justify the 8(a) Suspensions and would need to provide more than the O'Keefe videos to meet the adequate evidence standard;

j. SBA continues to maintain the 9.407 Suspensions despite being unable, in response to several requests by Plaintiffs' counsel, to identify any facts, events, or areas of concern on which SBA believes a suspension is justified;

k. SBA continues to maintain the 9.407 Suspensions despite the passage of one year, in direct violation of FAR 9.407–4;

l. On information and belief, SBA officials have in bad faith implored the Department of Justice to improperly investigate ATI, and request an extension of the 9.407 Suspensions without any justification for doing so in order to manufacture justification for its unlawful suspension after the fact; and

m. SBA's issuance of the suspension notices was contrary to law for additional reasons to be demonstrated by the administrative record.

211. Indeed, SBA's initial decision to suspend Plaintiffs, and its continued suspension of Plaintiffs after receiving Plaintiffs' responses to the suspensions, conflict with the evidence in the record that establishes Plaintiffs' present responsibility, compliance with applicable regulations, and satisfaction of contract requirements.

212. SBA's suspensions are further contrary to law because they treat Plaintiffs disparately from many similarly situated businesses that have not been suspended despite allegations that such businesses violated the performance of work requirements, including the limitations on subcontracting requirements, on their contracts; that someone other than a socially- and economically-disadvantaged individual controlled the company; and that a socially- and economically-disadvantaged individual was not receiving their proper distribution from the company, in violation of well-settled administrative law.

213. For each of these reasons, SBA's initial decision to suspend Plaintiffs and continued suspension of Plaintiffs after Plaintiffs submitted their responses to the suspension, are decisions that are contrary to law and should be overturned.

**COUNT IV – ADMINISTRATIVE PROCEDURE ACT**
**AGENCY ACTION NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**

214. Plaintiffs incorporate by reference Paragraphs 1 through 189 of this Complaint as if fully set forth and restated herein.

215. Agency action must be supported by substantial evidence, meaning that it must be based on such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

216. SBA's issuance of suspension notices to Plaintiffs, including the FAR 9.407 Suspension Notice to ATI and the Individual Plaintiffs and the suspension notices to ATI and its affiliates, and its continued suspension of Plaintiffs after Plaintiffs provided substantial evidence and responses to SBA's inquiries, are unsupported by substantial evidence because, *inter alia*:

a. The suspension notices rely entirely on conclusory statements and fail to provide any statement of facts found or reasoned analysis justifying the choices made;

b. The suspension is based on a bare administrative record which contains no reliable, credible evidence on which to base a suspension, and which was evidently constructed as a *post hoc* rationalization for the agency's action in light of the inclusion of two as-yet unpublished videos as part of the basis for the suspension;

c. SBA did not consider all relevant factors in rendering the suspension decisions, including but not limited to that: it is well known, including by SBA, that the source is an unreliable former convict who fabricates or manipulates statements to further his own political agenda, rendering any statements published by him incredible and unbelievable on their face; the factors on which SBA claims it relied to suspend Plaintiffs (conclusory, as noted above) are demonstrably false, untethered to a reliable factual record, and contradicted by substantial evidence, among other factors which SBA failed to consider; and, on information and belief, the recommendations of various SBA employees who stated that Plaintiffs should not be suspended;

d. SBA's suspension decisions rely on uncorroborated allegations of a short-term former employee of ATI that were selectively edited, contrary to well-settled legal principles related to suspension decisions that prohibit SBA from suspending a contractor based on uncorroborated allegations or unsupported suspicions;

e. SBA took no action to verify the facially suspect allegations on which it based its suspension decisions and Defendant Loeffler took no action, performed no investigation, and had no reliable evidence on which to make extremely damaging statements about Plaintiffs;

f. SBA leaked the FAR Suspension Notice to the disgraced source of the original false videos with the intent that he post it for public consumption, contrary to historical practice and for the purpose of drawing even more negative attention to the Parties to bolster SBA's misleading and unsupported narrative;

g. After the suspensions took effect, SBA received substantial evidence from Plaintiffs contradicting the suspension decision, but SBA has still not considered it—instead, it has ignored or disregarded Plaintiffs' evidence without any basis;

h. SBA deviated from its standard practices, procedures, and protocols by suspending Plaintiffs immediately without inquiring of any of Plaintiffs as to their response to the allegations or allowing Plaintiffs to provide evidence to avoid suspension when it has not done so for similarly situated contractors;

i. SBA continued the FAR 9.407 suspension even after a judge from the Office of Hearings and Appeals found that SBA was engaging in *post hoc* rationalizations to attempt to justify the 8(a) Suspensions and would need to provide more than the O'Keefe videos to meet the adequate evidence standard;

j. SBA continues to maintain the 9.407 Suspensions despite being unable, in response to several requests by Plaintiffs' counsel, to identify any facts, events, or areas of concern on which SBA believes a suspension is justified;

k. SBA continues to maintain the 9.407 Suspensions despite the passage of one year, in direct violation of FAR 9.407–4;

l. On information and belief, SBA officials have in bad faith implored the Department of Justice to improperly investigate ATI, and request an extension of the 9.407 Suspensions without any justification for doing so in order to manufacture justification for its unlawful suspension after the fact; and

m. SBA's suspensions are otherwise unsupported by substantial evidence as demonstrated by the administrative record.

217. Indeed, SBA's initial decision to suspend Plaintiffs, and its continued suspension of Plaintiffs after receiving Plaintiffs' responses to the suspensions, conflicts with the evidence in the record that establishes Plaintiffs' present responsibility, compliance with applicable regulations, and satisfaction of contract requirements.

218. No reasonable mind could conclude, based on the evidence in the record before SBA, that a suspension of any of Plaintiffs was warranted at the time of suspension or could be reasonably justified after receiving ATI's and the Individual Plaintiffs' substantial evidence supporting their present responsibility and compliance with applicable regulations.

219. For each of these reasons, SBA's initial decision to suspend Plaintiffs and continued suspension of Plaintiffs after Plaintiffs submitted their responses to the suspension, are unsupported by substantial evidence and should be overturned.

**COUNT V – DE FACTO DEBARMENT
IN VIOLATION OF THE DUE PROCESS CLAUSE
OF THE FIFTH AMENDMENT TO THE U.S. CONSTITUTION**

220. Plaintiffs incorporate by reference Paragraphs 1 through 189 of this Complaint as if fully set forth and restated herein.

221. The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."

222. Government contractors hold a constitutional liberty interest in the freedom from the stigmatizing effects of a suspension, particularly where the suspension is premised on accusations of dishonesty and fraud, without having the opportunity to clear their names. *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 963 (D.C. Cir. 1980).

223. To satisfy the Constitution's due process requirements, persons deprived of their liberty interests must receive adequate notice and an opportunity to be heard in a meaningful manner and at a reasonable time. *Mathews v. Eldridge*, 424 U.S. 319, 332, 334–35 (1976).

224. De facto debarment occurs when a contractor has, for all practical purposes, been suspended or blacklisted from working with the government without due process, adequate notice and a meaningful hearing. That includes both situations in which an agency states that a contractor will not be awarded contracts, and situations in which an agency's conduct demonstrates that a contractor will not be awarded future contracts.

225. An agency may not impose even a temporary suspension without providing the core requirements of due process—namely, adequate notice and a meaningful hearing. *Com. Drapery Contractors, Inc. v. United States*, 133 F.3d 1 (D.C. Cir. 1998).

226. On October 20, 2025, a clearly edited and obviously misleading video was

published on social media which displayed a number of false, defamatory, and wholly unsupported conclusory statements about ATI and the Individual Plaintiffs.

227. On October 21, 2025—the very next day—SBA suspended ATI and the Individual Plaintiffs from all government contracting, immediately, and without first conducting any investigation, obtaining corroborating or supporting evidence, or speaking with ATI or the Individual Plaintiffs.

228. On or around October 21, 2025, SBA, through an as-yet unidentified agent, leaked the FAR Suspension Notice to a disgraced internet personality with the intent that he post it for public consumption. SBA did so to further publicize the original negative allegations against the Parties, amplify the damaging stigma against them, and essentially force the hand of federal agencies to stop doing business with the Parties (including by terminating ATI's contracts).

229. Within days, the agencies followed that lead and terminated almost all of ATI's government contracts for convenience, stripping ATI of over 90% of its monthly income and leading to the furlough and eventual termination of ATI's workforce. In the year since the issuance of the FAR Suspension Notice, ATI's revenues have dropped even further, with only two small remaining non-terminated government contracts, one of which will expire by the end of 2026.

230. On November 7, 2025, based solely on its prior suspension of ATI, and without first conducting any investigation, obtaining corroborating or supporting evidence, or speaking with any of the Plaintiffs, SBA suspended ATI's affiliates from all government contracting.

231. SBA did not provide Plaintiffs with notice or an opportunity to be heard prior to the suspension.

232. Since the issuance of the FAR Suspension, SBA has consistently ignored and/or disregarded evidence submitted by Plaintiffs and written responses to the allegations underlying

SBA's suspension.

233. Plaintiffs' written responses to SBA's inquiries conclusively demonstrate that the allegations on which SBA suspended Plaintiffs are false and contrary to the actual evidence before SBA.

234. SBA left Plaintiffs' suspensions in place even after receiving Plaintiffs' written responses and the substantial evidence supporting their present responsibility.

235. From the time of the suspensions through the present, each time that SBA requested additional documents, Plaintiffs complied, supplying extensive documentation responsive to SBA's requests and conclusively demonstrating Plaintiffs' present responsibility.

236. None of the documents provided by Plaintiffs in response to SBA's requests supported SBA's allegations of purported wrongdoing or justified SBA's suspensions.

237. SBA ignored or refused to respond to Plaintiffs' repeated inquiries about the status of the suspension reviews.

238. On August 21, 2026, SBA informed Plaintiffs that it required still *more* documents from ATI. All of the new document requests seek documents that are either duplicative of those already provided by ATI in response to prior requests, are irrelevant to the basis of ATI's FAR suspension or ATI's compliance with applicable regulations, or are so onerous that a response would take weeks, if not months, to provide.

239. On information and belief, SBA's latest request for documents was a stalling tactic imposed by agency leadership with no experience in suspension and debarment matters (not the career SBA employees who regularly handle such matters), strategically designed to impose onerous obligations on ATI that would take significant time and effort to fulfill, in order to avoid having to take final action in response to ATI's conclusive proof that its suspension is unjustified.

240. Nevertheless, Plaintiffs provided fulsome responses on October 1, 2026, again demonstrating their present responsibility and compliance with SBA's program regulations.

241. SBA has not provided Plaintiffs with a meaningful hearing or opportunity to be heard. To the extent that SBA has provided Plaintiffs with any hearing at all, that hearing was neither held at a meaningful time—*i.e.*, before or immediately after the suspension—nor in a meaningful manner.

242. Plaintiffs lost their previously-awarded contracts through terminations for convenience issued shortly after SBA issued the suspension. All of those terminations followed Defendant Loeffler's social media post, which was re-posted with additional false allegations against ATI by Treasury Secretary Scott Bessent. A number of ATI's contracts were with the Treasury Department at the time.

243. As of the date of this filing, Plaintiffs remain suspended. They are not permitted to submit bids for or otherwise perform on new government contracts. As a result, they have had to turn down multiple requests from federal agencies and teaming partners who sought out ATI for new contracting opportunities.

244. ATI made SBA officials aware of those contracting opportunities, but SBA took no action to lift the suspensions and prevent the ongoing harm.

245. To the contrary, SBA remains committed to the destruction of ATI's business and Plaintiffs' reputation.

246. For example, despite SBA having no evidence whatsoever—let alone adequate evidence—to justify ongoing suspension and having substantial evidence entirely refuting all of the stated bases for suspension since at least November 20, 2025, on information and belief, SBA officials have reached out to one or more Department of Justice officials in bad faith to encourage

those officials to request an extension of the suspension. The result has been that, despite the passage of a full year since the suspensions and the FAR's mandate that the suspensions be lifted, SBA has maintained the suspensions contrary to law.

247. Defendants' statements and conduct evidence a systematic effort by SBA and its leadership to prevent Plaintiffs from obtaining future government contracts.

248. As a direct and proximate result of SBA's de facto debarment of Plaintiffs, Plaintiffs have been damaged. Plaintiffs' personal and business reputations have been destroyed such that they are unlikely to ever return to work in the same manner they could work before.

249. In addition to the stigma caused by Defendants' unlawful suspension of Plaintiffs and their defamatory insinuations that Plaintiffs engaged in fraud or dishonesty in their capacity as federal contractors, Plaintiffs have lost nearly $130 million in existing federal government contracts that were terminated as a result of the suspensions, in addition to hundreds of millions of dollars of additional lost contracting opportunities, including those opportunities offered during the suspensions.

## PRAYER FOR RELIEF

Plaintiffs demand judgment against Defendants, and each of them, jointly and severally, and respectfully request that the Court enter a judgment ordering the following relief:

1. A Judgment declaring unlawful and setting aside the suspensions imposed on Plaintiffs under FAR 9.407;
2. An Order preliminarily and permanently lifting the suspensions imposed on Plaintiffs under FAR 9.407 and prohibiting SBA from engaging in any activities that constitute de facto debarment of Plaintiffs;
3. A Judgment awarding Plaintiffs reasonable attorneys' fees and costs; and
4. An award of such other and further relief as this Court deems necessary and appropriate.

Dated: October 22, 2026

**MORGAN, LEWIS & BOCKIUS LLP**

/s/ *Justin D. Weitz*
Justin D. Weitz (Bar No. 90008910)
1111 Pennsylvania Avenue, NW
Washington, DC 20004
justin.weitz@morganlewis.com
Phone: +1.202.739.5932

Matthew D. O'Keefe (*pro hac vice* forthcoming)
One Federal Street
Boston, MA 02110
matthew.okeefe@morganlewis.com

**PILIEROMAZZA LLC**

/s/ *Matthew E. Feinberg*
Matthew E. Feinberg (Bar No. 991638)
Caitlin E. Trevillyan (Bar No. 888155614)
Kane T. Smith (Bar No. 90007778)
Shelleah Cannon (*pro hac vice* forthcoming)
1001 G Street NW, Suite 1100
Washington, DC 20001
mfeinberg@pilieromazza.com
ctrevillyan@pilieromazza.com
ksmith@pilieromazza.com
scannon@pilieromazza.com
Phone: +1.202.857.1000

**HONIGMAN LLP**

/s/ *Mark Cipolletti*
Mark J. Cipolletti (Bar No. 90031300)
1440 New York Avenue, NW, Suite 200
Washington, DC 20005
mcipolletti@honigman.com
Phone: +1.202.521-0569

**THOMPSON HINE LLP**

*/s/ Edward T. Delisle*
Edward T. DeLisle (Bar No. 90014838)
1919 M Street, N.W., Suite 700
Washington, D.C. 20036
edward.delisle@thompsonhine.com
Phone: +1.202.973.2725

*Attorney for Plaintiffs, ATI Government Solutions, LLC; SF Consulting Services, LLC; SF Design Solutions, LLC; SF Network Services, LLC; SF Transformation Services, LLC; SFS Global, LLC; SFS Global/Tiburon JV; Firmadge Crutchfield; Scott Deutschman; and Marina Mulyayeva*