IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ATI GOVERNMENT SOLUTIONS, LLC, et al.<br><br>Plaintiffs<br><br>v.<br><br>UNITED STATES SMALL BUSINESS ADMINISTRATION, et al.<br><br>Defendants | Case No. 1:26-cv-03693-ACR<br>Hon. Ana C. Reyes |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY <u>RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 3

A. Plaintiffs' Participation in the 8(a) Program .......... 3

B. James O'Keefe Targets ATI .......... 5

C. The SBA Blindly Adopts O'Keefe's False Narrative and Issues Suspensions .......... 6

D. Plaintiffs' Immediate Efforts to Resolve the Suspensions .......... 9

E. The 8(a) Program Suspension Appeal .......... 11

F. Plaintiffs' Continued Efforts to End the FAR Suspensions .......... 12

III. ARGUMENT .......... 15

A. This Court Has Subject Matter Jurisdiction to Enter a Temporary Restraining Order and Preliminary Injunction .......... 15

B. This Court Should Enter a Temporary Restraining Order and Preliminary Injunction Compelling the SBA to Lift Plaintiffs' Suspension .......... 20

1. Plaintiffs Are Likely To Prevail on the Merits .......... 20

a. Plaintiffs Are Likely To Prevail on their APA Claims .......... 20

i. The Suspensions Do Not Rest on Adequate Evidence .......... 22

ii. The SBA Improperly Failed to Consider Exonerating Evidence .......... 27

iii. The SBA's Differential Treatment of Plaintiffs vis-à-vis Other Government Contractors is Arbitrary, Capricious, and Contrary to Law .......... 31

b. Plaintiffs are Likely to Prevail on Their Constitutional Claim .......... 34

2. Plaintiffs Will Suffer Imminent Irreparable Harm if a Temporary Restraining Order and Injunction Are Not Granted .......... 39

3. The Balance of Harms and the Public Interest Favor Granting a Temporary Restraining Order and Injunction .......... 42

C. This Court Should Hold an Evidentiary Hearing on the Motion .......... 43

D. This Court Should Waive Rule 65(c)'s Security Requirement or Impose a Nominal Security .......... 44

IV. CONCLUSION .......... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B.-B. v. Morgan*,
548 F. Supp. 3d 209 (D.D.C. 2020) ....................20

*Matter of Alliance Steel Constr., Inc.*,
SBA BDP-186, 2002 WL 32988164 (Dec. 12, 2002) ....................26

*Alpine Sec. Corp. v. FINRA*,
121 F.4th 1314 (D.C. Cir. 2024) ....................41

*Am. Bar Ass'n v. U.S. Dep't of Just.*,
783 F. Supp. 3d 236 (D.D.C. 2025) ....................42

*Am. Petroleum Inst. v. S.E.C.*,
714 F.3d 1329 (D.C. Cir. 2013) ....................43

*Ardmore Consulting Grp., Inc. v. Contreras-Sweet*,
118 F. Supp. 3d 388 (D.D.C. 2015) ....................28

*Armstrong v. Manzo*,
380 U.S. 545 (1965) ....................37

*Art-Metal USA, Inc. v. Solomon*,
473 F. Supp. 1 (D.D.C. 1978) ....................35, 36, 37, 39

*Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
745 F.2d 677 (D.C. Cir. 1984) ....................30

*Barrow v. Graham*,
124 F. Supp. 2d 714 (D.D.C. 2000) ....................14

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972) ....................38

*Beatty v. Trump*,
834 F. Supp. 3d 41 (D.D.C. 2026) ....................13

*Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp. 3d 290 (D.D.C. 2025) ....................44

*Bradshaw v. Veneman*,
338 F. Supp. 2d 139 (D.D.C. 2004) ....................14

*Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*,
403 F.3d 771 (D.C. Cir. 2005) .....33

*Burlington Truck Lines v. United States*,
371 U.S. 156 (1962) .....21

*Butte County, Cal. v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) .....27, 28, 30

*Camelot Banquet Rooms, Inc. v. SBA*,
458 F. Supp. 3d 1044 (E.D. Wis. 2020) .....19

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) .....15

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) .....37

*Climate United Fund v. Citibank, N.A.*,
778 F. Supp. 3d 90 (D.D.C. 2025) .....42

*Com. Drapery Contractors, Inc. v. United States*,
133 F.3d 1 (D.C. Cir. 1998) .....34

*Comcast Corp. v. FCC*,
579 F.3d 1 (D.C. Cir. 2009) .....28

*DACO Invs., LLC v. U.S. Small Bus. Admin.*,
Case No. 6:22-CV-01444, 2024 WL 750594 (W.D. La. Feb. 22, 2024) .....19

*DC Pres. League v. Dep't of Interior*,
No. 1:26-cv-477-ACR, 2026 WL 3210227 (D.D.C. Oct. 26, 2026) .....43, 44

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) .....34

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999) .....44

*Elizabeth Grady Sch. of Esthetics & Massage Therapy v. Cardona*,
Civil Action No. 23-cv-12461-ADB, 2023 WL 8477854 (D. Mass. Dec. 7, 2023) .....19

*Elk Assocs. Funding Corp. v. U.S. Small Bus. Admin.*,
858 F. Supp. 2d 1 (D.D.C. 2012) .....16

*Experience Works, Inc. v. Chao*,
267 F. Supp. 2d 93 (D.D.C. 2003) .....14

*FHA v. Burr*,
[309 U.S. 242 (1940)] ........................................................................................18

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010)..........................................................................................20

*Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*,
916 F.3d 792 (10th Cir. 2019) ..........................................................................14

*Friedler v. Gen. Servs. Admin.*,
271 F. Supp. 3d 40 (D.D.C. 2017)...................................................................27

*Garcia Domingo v. Castro*,
806 F. Supp. 3d 1246 (D.N.M. 2025)..............................................................13

*Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016)..........................................................................14

*Guillory v. Dalbour*,
Civil Action No. 2:15-cv-02452, 2016 WL 5415072 (W.D. La. Sept. 27,
2016) ................................................................................................................24

*Hagelin v. Fed. Election Comm'n*,
411 F.3d 237 (D.C. Cir. 2005)..........................................................................33

*Horne Bros., Inc. v. Laird*,
463 F.2d 1268 (D.C. Cir. 1972)..................................................22, 24, 36, 37

*Inchcape Shipping Servs. Holdings Ltd. v. United States*,
No. 13-953 C, 2014 WL 12838793 (Fed. Cl. Jan. 2, 2014)........................24, 25

*Jacobowitz v. United States*,
424 F.2d 555 (Ct. Cl. 1970) ..............................................................................25

*Kreis v. Sec'y of Air Force*,
406 F.3d 684 (D.C. Cir. 2005)..........................................................................33

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025)..........................................................14, 15

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016).......................................................................14, 42

*Level the Playing Field v. Fed. Election Comm'n*,
961 F.3d 462 (D.C. Cir. 2020)..........................................................................33

*McCabe v. Barr*,
490 F. Supp. 3d 198 (D.D.C. 2020)..................................................................37

*Media Matters for Am. v. FTC*,
805 F. Supp. 3d 105 (D.D.C. 2025)....................20

*Mexichem Specialty Resins, Inc. v. Env't Prot. Agency*,
787 F.3d 544 (D.C. Cir. 2015)....................41

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983)....................21, 27, 28

*Nken v. Holder*,
556 U.S. 418 (2009)....................14, 15, 42

*In re NTE Conn., LLC*,
26 F.4th 980 (D.C. Cir. 2022)....................41

*Oklahoma Aerotronics, Inc. v. United States*,
661 F.2d 976 (D.C. Cir. 1981)....................16, 17, 18, 19

*Oklahoma Aerotronics, Inc. v. United States*,
Civil Action No. 78-0796 (D.D.C. June 30, 1980)....................17

*Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*,
631 F.2d 953 (D.C. Cir. 1980)....................34, 37, 38

*Phillips v. Mabus*,
894 F. Supp. 2d 71 (D.D.C. 2012)....................34

*Propert v. Dist. of Columbia*,
948 F.2d 1327 (D.C. Cir. 1991)....................37

*Matter of R.A. Quarshie & Assoc., Inc.*,
SBA No. BDPE-605, 2022 WL 17076952 (Nov. 1, 2022)....................26

*Remmie v. Mabus*,
898 F. Supp. 2d 108 (D.D.C. 2012)....................20

*San Antonio Gen. Maint., Inc. v. Abdnor*,
691 F. Supp. 1463 (D.D.C. 1987)....................16

*SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*,
769 F.3d 1184 (D.C. Cir. 2014)....................27

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011)....................15

*Simms v. Dist. of Columbia*,
872 F. Supp. 2d 90 (D.D.C. 2012)....................44

*Singh v. Berger*,
56 F.4th 88 (D.C. Cir. 2022) ....................14

*Sloan v. Dep't of Hous. & Urb. Dev.*,
231 F.3d 10 (D.C. Cir. 2000) ....................22

*Sourbeer v. Robinson*,
791 F.2d 1094 (3d Cir. 1986) ....................38

*Sterlingwear of Bos., Inc. v. United States*,
11 Cl. Ct. 879 (1987) ....................27

*Streever v. Mullin*,
Civil Action No. 26-2356 (RC), 2026 WL 2720475 (D.D.C. Sept. 15, 2026) ....................15

*Taylor v. Trump*,
823 F. Supp. 3d 17 (D.D.C. 2026) ....................37, 38

*Theodore Roosevelt Conservation P'ship v. Salazar*,
616 F.3d 497 (D.C. Cir. 2010) ....................43

*TikTok Inc. v. Trump*,
507 F. Supp. 3d 92 (D.D.C. 2020) ....................42

*U.S. Women's Chamber of Com. v. U.S. Small Bus. Admin.*,
Civil Action No. 1:04–CV–01889, 2005 WL 3244182 (D.D.C. Nov. 30, 2005) ....................16

*Ulstein Maritime, Ltd. v. United States*,
833 F.2d 1052 (1st Cir. 1987) ....................18, 19

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) ....................13

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951) ....................28

*Valley Forge Flag Co., Inc. v. Kleppe*,
506 F.2d 243 (D.C. Cir. 1974) (per curiam) ....................16

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
559 F.2d 841 (D.C. Cir. 1977) ....................14, 41

*Washington v. Reno*,
35 F.3d 1093 (6th Cir. 1994) ....................42

*Whirlpool Corp. v. Occupational Safety & Health Rev. Comm'n*,
645 F.2d 1096 (D.C. Cir. 1981) ....................25

*Widerman Malek P.L. v. Carranza*,
Case No. 6:20-cv-665-Orl-37GJK, 2020 WL 6748083 (M.D. Fla. June 22, 2020) ....19

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ....14, 15

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n*,
758 F.2d 669 (D.C. Cir. 1985) ....41

**Statutes**

5 U.S.C. § 701 ....15

5 U.S.C. § 702 ....15

5 U.S.C. § 703 ....15

5 U.S.C. § 704 ....15

5 U.S.C. § 705 ....15

5 U.S.C. § 706 ....15

5 U.S.C. § 706(1) ....15

5 U.S.C. § 706(2)(A) ....18, 20

15 U.S.C. § 634(b) ....16

15 U.S.C. § 634(b)(1) ....16, 17, 18, 19

15 U.S.C. § 637(a) ....3

28 U.S.C. § 1331 ....15

**Other Authorities**

13 C.F.R. § 124.2 ....40

13 C.F.R. § 124.602(a) ....29

13 C.F.R. § 124.602(a)(1) ....29

13 C.F.R. § 124.604 ....29

48 C.F.R. § 9.405–1(a)(1) ....8

48 C.F.R. § 9.405(a) ....8

48 C.F.R. § 9.405(b) ....................................................................................................8

48 C.F.R. § 9.405(c)....................................................................................................8

48 C.F.R. § 9.407–1(b)(1)....................................................................................................25, 27

48 C.F.R. § 9.407–2(a)....................................................................................................22

48 C.F.R. § 9.407–3(c)(6) ....................................................................................................22

48 C.F.R. § 9.407–3(d)(1)....................................................................................................22

48 C.F.R. § 9.407–4(b) ....................................................................................................12, 13, 39

FAR 9.407 .................................................................................................... *passim*

FAR 9.407–1(b)(1) ....................................................................................................23, 24, 27, 39

FAR 9.407–4(b) ....................................................................................................13, 39

Fed. R. Civ. P. 65....................................................................................................3, 13, 44

Fed. R. Civ. P. 65(a)(1)....................................................................................................13

Fed. R. Civ. P. 65(b)(1)....................................................................................................13

Fed. R. Civ. P. 65(c) ....................................................................................................44

U.S. CONST. amend. V ....................................................................................................34

U.S. DEP'T OF JUST., *Government Contractor Agrees to Pay Record $48.5 Million to Resolve Claims Related to Fraudulent Procurement of Small Business Contracts Intended for Service Disabled Veterans*, Feb. 23, 2022, available at https://www.justice.gov/usao-edwa/pr/government-contractor-agrees-pay-record-485-million-resolve-claims-related-fraudulent (last visited Oct. 29, 2026) ....................................................................................................32

U.S. DEP'T OF JUST., *Government Contractor Pays $742,500 to Settle False Claims Act Allegations in Obtaining Contracts Reserved for Eligible Small Businesses*, Mar. 23, 2023, available at https://www.justice.gov/usao-edva/pr/government-contractor-pays-742500-settle-false-claims-act-allegations-obtaining (last visited Oct. 29, 2026) ....................................................................................................32

United States Constitution Fifth Amendment Due Process Clause ..............................................34

## I. INTRODUCTION

This case is about the Small Business Administration's willful abuse of its power to destroy one of the very businesses that it was created to help. The agency's target was ATI Government Solutions, a tribally-owned government contracting business that participates in the SBA's 8(a) Business Development Program. A well-regarded and highly reputable contracting partner to agencies across the federal government, ATI would seem to be an unlikely victim of the SBA's arbitrary, capricious, and unconstitutional conduct. But on October 20, 2025, a discredited internet provocateur published a salacious, heavily edited YouTube video accusing ATI of misconduct. Outrageous social media videos usually do not—and should not—lead a government agency, commanded to behave within the confines of the Constitution, Administrative Procedure Act ("APA"), and the Federal Acquisition Regulation ("FAR"), to act rashly. This SBA, however, disregarded caution and the law, and chose to go after ATI.

As the administrator of the 8(a) Program, the SBA could have taken any of several reasonable courses of action. It could have assessed the reliability of the video produced by a long-discredited source, recognized that it contained no reliable evidence of wrongdoing, and opted to simply ignore the baseless accusations. It could have reached out to ATI, or any of its executives or directors, for their response to the accusations *before* issuing baseless suspensions. Or it could have initiated a bona fide investigation of ATI, seeking to determine—based on actual evidence, in accordance with the procedures established by law—whether there was any truth to the YouTuber's charges. If the SBA had done any of those things, it would have learned then what it surely knows now: the accusations in the videos are without merit, false, and entirely unsupported by evidence.

Abdicating its duties under the Due Process Clause and the APA, the SBA chose a different

path. On October 21, 2025—only one day after the video was published—the SBA, with a stroke of a pen and an aggressive tweet by its Administrator, suspended ATI and its executives from government contracting. The SBA did not provide notice or a hearing prior to the suspension, and to this day—more than a year later—has never provided ATI with a meaningful opportunity to be heard. When Plaintiffs requested the administrative record underlying the SBA's suspension decision, the agency pointed back to the aforementioned YouTube video, together with two other videos by the same creator (rife with heavily edited and equally spurious accusations) that had not even been published at the time of the suspension. An internal SBA Office of Hearings and Appeals ("OHA") judge tasked with assessing the validity of the SBA's narrower suspension of ATI from participation in the 8(a) Program found that the SBA "made no effort whatever to substantiate" the claims in the videos, ordering the SBA to supplement the administrative record with whatever evidence it had. Without any evidence to offer, the SBA folded and dropped that suspension—but left the broader suspension from all government contracting under the FAR, based on the same threadbare record, in place.

Meanwhile, Defendant Loeffler took multiple victory laps on social media, publicly painting ATI and its CEO, Plaintiff Crutchfield, as fraudulent bad actors. All the while, Plaintiffs did everything in their power to assuage the SBA's purported concerns (however unfounded). Within 30 days of the first suspension, Plaintiffs produced voluminous documentary evidence that conclusively demonstrated the baselessness of the suspensions; over the months that followed, it provided over *12,500 pages* of exculpatory evidence supporting their present responsibility and answered every question the agency posed. When pressed, SBA officials have been wholly unable to identify a single piece of evidence or area of concern that justifies the continued suspension. Yet the suspension remains in place, because this SBA and this Administrator refuse to admit that

they were wrong. What may have begun as an embarrassing example of agency incompetence has become a year-long saga of bad faith.

In the year-plus since the SBA suspended and *de facto* debarred Plaintiffs, their business has been incalculably harmed. The SBA's actions have functionally shuttered the Plaintiff companies, cost nearly all of ATI's 67 employees their jobs, and irreparably damaged Plaintiffs' reputations. And every day the suspensions and *de facto* debarment remain in effect, Plaintiffs' injury grows.

Enough is enough. Because the SBA has refused to engage in good faith or remedy the harm it is causing, because the harm compounds every day, and because the SBA's actions offend the Constitution and rule of law, this Court should enter a preliminary injunction and temporary restraining order pursuant to Federal Rule of Civil Procedure 65.

## II. FACTUAL BACKGROUND

### A. Plaintiffs' Participation in the 8(a) Program

As part of its mission to "help Americans start, build, and grow small businesses," the SBA administers the 8(a) Business Development Program (the "8(a) Program"), a Congressionally-mandated government contracting initiative intended to promote business opportunities for firms owned and controlled by socially and economically disadvantaged individuals and groups, including federally recognized Indian tribes. Dkt. No. 1 ¶ 2; 15 U.S.C. § 637(a) (establishing the 8(a) Program).

In or around 2018, Plaintiff ATI—a government contractor majority-owned by the Susanville Indian Rancheria Tribe (the "Tribe") through its tribal holding company, SIRCO Federal Services, Inc. ("SFSI")—applied to participate in the 8(a) Program. Dkt. No. 1 ¶ 80. As part of its application, ATI shared the Tribe's strategic plan for the development of tribal opportunities at ATI (the "Tribal Management Development Plan"). *Id.* ¶ 81. The Tribal

Management Development Plan acknowledged a disparity between the business needs of the Tribe's companies (including ATI) and the then-existing shortage of needed expertise and management experience among the Tribe's population. *Id.* ¶ 82. Accordingly, the Tribal Management Development Plan contemplated hiring outside subject-matter experts to assist with and lead the modernization and development of SFSI and its subsidiaries, while prioritizing and creating opportunities for members of the Tribe. *Id.* ¶ 83.

On February 15, 2019, the SBA blessed ATI's Tribal Management Development Plan and approved ATI's 8(a) Program application. *Id.* ¶ 87. As an 8(a) Program participant, ATI was a success: it reported $229.4 million in gross revenue from federal contracts from 2019–2025, grew to 67 employees, and gained a reputation as a reliable and responsible contractor, successfully performing dozens of contracts as either a prime contractor or as part of a joint venture for various federal agencies. *Id.* ¶¶ 87–90. Meanwhile, the Tribe (again through SFSI) created additional tribally-owned and tribally-managed entities to perform other government contracting work in different sectors, enhancing opportunities for the Tribe and its members. *Id.* ¶ 91. These include Plaintiffs SF Design, SF Network, SF Transformation, and SF Consulting,[1] all of which were founded as part of SFSI's plan to create tribal financial autonomy through leadership, training, mentorship, and employment opportunities for tribal members. *Id.*

At all times, Crutchfield, Deutschman, Mulyayeva (collectively, the "Individual Plaintiffs") and the SFSI Board have been committed to operating ATI in compliance with the SBA's regulations for the small business programs in which it operates (including specifically the 8(a) Program) and with the requirements of its federal contracts. *Id.* ¶ 92.

---

[1] Plaintiff SFS Global is a separate SFSI subsidiary, and Plaintiff SFS Global/Tiburon is a joint venture majority owned by SFS Global. Dkt. No. 1 ¶¶ 51–52.

### B. James O'Keefe Targets ATI

For reasons unknown to Plaintiffs, ATI's success as a government contractor and its status as an 8(a) Program participant drew the ire of James O'Keefe, a widely discredited internet provocateur well-known for publishing misleading, deceptive, hidden-camera videos to amplify political positions he supports. *Id.* ¶¶ 1, 9, 60–62. In or around spring 2025, O'Keefe catfished a low-level ATI employee (who separately ran a catering company) by posing as a potential corporate catering customer. *Id.* ¶¶ 96–97. In keeping with his *modus operandi* and history of deceptive tactics, O'Keefe used hidden cameras to record his conversation with the employee. *Id.* ¶ 98. He baited the employee into making comments that he portrayed as supporting his own false, misleading, and deceptive statements about ATI, the 8(a) Program, and government contracting in general. *Id.* O'Keefe then produced a salacious (but utterly unbelievable) supercut-style video in which he spliced together individual moments of the conversation—often no more than a couple of seconds long—and interwove those clips with his own false commentary about ATI and 8(a) Program participants generally. *Id.* The video falsely portrayed the employee as having claimed that ATI acted as a pass-through on its 8(a) federal contracts, allowing large businesses to gain access to small business contracts they were not eligible to receive. *Id.*

O'Keefe built a self-serving and false narrative, and then fired it at his target: ATI. On October 20, 2025, O'Keefe launched the video to his YouTube channel and posted about the video on the social media platform X. *Id.* ¶ 99. Since that initial video, O'Keefe and his "media company," O'Keefe Media Group, have launched several similar (and likewise deceptive) videos, continuing to amplify the unambiguously false narrative that ATI is defrauding the federal government. *Id.* ¶ 100. But O'Keefe's actions are not what warrant the Court's attention; it is what happened next that should appall this Court.

### C. The SBA Blindly Adopts O'Keefe's False Narrative and Issues Suspensions

Within hours of the video's launch—and without any factual basis or investigation whatsoever—Defendant Loeffler elevated the defamatory and false video on her X account, stating that the "SBA has launched an investigation into ATI Government Solutions and Susanville Indian Rancheria," continuing that "[t]his is why we have been conducting a full review of the 8(a) program. . . . [W]hat we've discovered so far has been institutionalized abuse, which potentially amounts to billions of dollars in federal contracts[.]" *Id.* ¶ 103.

On October 21, 2025, *just one day* after the O'Keefe video launched, without conducting any investigation whatsoever or reaching out to ATI, the Tribe, the SFSI Board, or the Individual Plaintiffs, the SBA issued a "Notice of Suspension" that invoked FAR 9.407 (the "FAR Suspension Notice"), and suspended ATI and the Individual Plaintiffs from all government contracting immediately and indefinitely.[2] *Id.* ¶¶ 18, 104; *see also* **Exhibit 1**, FAR Suspension Notice to ATI, Crutchfield, Deutschman, and Mulyayeva, Oct. 21, 2025. The FAR Suspension Notice incorrectly alleges, in conclusory fashion and without reliance on any supporting investigation, evidence, or documentation (beyond O'Keefe's false and facially incredible video), that ATI's "Contracts Manager" admitted that:

> 1. The Susanville Indian Rancheria tribe does not in effect control ATI and the tribe knowingly ceded control to three nondisadvantaged individuals in ATI's executive team, specifically Mr. Crutchfield, Mr. Deutschman, and Ms. Mulyayeva;
> 2. ATI uses its 8(a) status to act as a "pass-through" for other businesses that would otherwise be ineligible for 8(a) awards;
> 3. ATI routinely does not meet the limitations on subcontracting requirements on its 8(a) contracts;
> 4. The tribe does not proportionally benefit from ATI's 8(a) contracts. Rather the tribe receives a percentage that is smaller than its ownership interest, and the remaining benefit goes to the nondisadvantaged management team.

---

[2] The FAR Suspension Notice was signed by SBA Suspension and Debarment Official John Klein and transmitted to ATI by SBA Attorney Edmund Bender. At the time of transmittal, Bender was furloughed as a result of a government shutdown and unable to work, further supporting the conclusion that the SBA did not conduct and could not have conducted any investigation prior to suspending Plaintiffs. Dkt. No. 1 ¶ 108.

Dkt. No. 1 ¶ 137. On October 22, 2025, Defendant Loeffler publicized ATI's suspension to social media, linking back to her earlier post promoting the false and defamatory video, further amplifying the false narrative that ATI was engaged in fraud.[3] *Id.* ¶ 114.

On October 23, 2025, the SBA issued an additional suspension notice to ATI (the "8(a) Suspension Notice"), this time suspending ATI from participating in the 8(a) Program in particular (the "8(a) Suspension"). *Id.* ¶ 115; *see also* **Exhibit 2**, 8(a) Suspension Notice to ATI, Oct. 23, 2025. The bases identified for the 8(a) Suspension Notice were identical to the bases identified in the FAR Suspension Notice. Dkt. No. 1 ¶ 116; *compare* Exh. 1 (FAR Suspension Notice grounds for suspension), *with* Exh. 2 (reciting the same bases for suspension as the FAR Suspension Notice). Additional FAR suspension notices concerning the remaining Plaintiff entities soon followed, all premised purely on the companies' affiliation with Crutchfield and/or ATI. *Id.* ¶ 117.[4] Defendant Loeffler again published the suspensions to social media, falsely portraying Plaintiff Crutchfield as the leader of a multi-company "network" conspiring to defraud the Government:

---

[3] O'Keefe posted the FAR Suspension Notice to his YouTube platform the day after the suspension issued—*i.e.*, before Defendant Loeffler announced the suspension on her own social media account. Dkt. No. 1 ¶ 110. Suspension notices are not publicly available online or elsewhere, and Plaintiffs did not share the FAR Suspension Notice with anyone. That suggests an as-yet unidentified SBA employee leaked the FAR Suspension Notice to O'Keefe in bad faith and with the knowledge and/or intent that it would be published for public consumption. *Id.*

[4] *See* **Exhibit 3**, FAR Suspension Notice to SF Consulting, Nov. 7, 2025; **Exhibit 4**, FAR Suspension Notice to SF Design, Nov. 7, 2025; **Exhibit 5**, FAR Suspension Notice to SF Network, Nov. 7, 2025; **Exhibit 6**, FAR Suspension Notice to SF Transformation, Nov. 7, 2025; **Exhibit 7**, FAR Suspension Notice to SFS Global, Nov. 7, 2025; **Exhibit 8**, FAR Suspension Notice to SFS Global/Tiburon, Nov. 7, 2025.



Post

O'Keefe Media Group reposted

Kelly Loeffler
@SBA_Kelly

As part of our ongoing investigation into ATI Government Solutions, SBA has uncovered and now suspended a network of SEVEN additional companies connected to its CEO Firmadge Crutchfield.

Like ATI, amid the investigation, these companies are prohibited from bidding on any new federal contracts, 8(a) set-asides, or applying for federal assistance. Their names have been provided to law enforcement.

Thank you to every federal agency that has joined us in the effort to crack down on fraud in the 8(a) Program for "socially and economically disadvantaged" small businesses.

As our government-wide audit continues, we remind the public to submit whistleblower tips to SBA.gov/oig

Kelly Loeffler @SBA_Kelly · Oct 22, 2025
As of today, the SBA has officially suspended ATI Government Solutions, which is majority-owned by Susanville Indian Rancheria, as well as three of its executives, from conducting any new business with the federal government.

While we continue our investigation, ATI and its x.com/SBA_Kelly/stat...

12:01 PM · Nov 8, 2025 · 1.2M Views

106 877 3.8K 109

Dkt. No. 1 ¶ 118.

When a contractor is suspended, it is prohibited from bidding on or receiving new contracts or subcontracts, and agencies cannot renew or extend the contractor's existing contracts. 48 C.F.R. § 9.405(a)–(c). A suspension does not ordinarily require the termination of a suspended company's existing contracts. 48 C.F.R. § 9.405–1(a)(1). But the voice of a Cabinet official rings loudly. Thus, after Defendant Loeffler's public false statements about ATI and Crutchfield and amplification of the suspensions, federal agencies soon issued stop work orders on, and then terminated, many of ATI's federal contracts, stripping ATI of over 90% of its monthly revenue. Dkt. No. 1 ¶ 229.

The rushed terminations of most of ATI's contracts, and the subsequent expiration (and non-renewal) of those few contracts that survived the first weeks after the suspensions, have cost

ATI nearly $130 million in previously-awarded contracts and a projected $500 million in prospective new business for ATI and SFSI's suspended subsidiaries. *Id.* ¶¶ 179–80. The suspensions have stopped the Tribe's affected businesses in their tracks, destroying an essential revenue stream for the Tribe and critically compromising its long-term financial outlook. *Id.* ¶ 182. The suspensions have irreparably damaged Plaintiffs' personal and professional reputations, and every day that the suspensions remain in place, that economic and reputational harm compounds. *Id.* ¶¶ 182, 245.

### D. Plaintiffs' Immediate Efforts to Resolve the Suspensions

Plaintiffs have worked tirelessly to resolve the baseless suspensions since they were first issued. *Id.* ¶ 145. In addition to providing over 12,500 pages of documents and information supporting their present responsibility and refuting the SBA's suspension bases, they have pursued every available opportunity to meet with SBA personnel to answer any questions SBA officials might have. *Id.* The SBA, on the other hand, has not provided a scintilla of evidence to corroborate the claims made in the videos that underlie its actions. *Id.* ¶ 146.

On November 6, 2025, ATI's counsel requested that the SBA provide a copy of the administrative record underlying ATI's FAR Suspension (the "Administrative Record"). *Id.* ¶ 119. The SBA provided the Administrative Record via email on November 19, 2025, just one day prior to the due date for ATI's response to the FAR Suspension Notice. *Id.* ¶ 120. The Administrative Record is egregiously—and embarrassingly—bare, particularly given the exceedingly aggressive tactics employed by the SBA and Defendant Loeffler. Across a cover e-mail and just 16 additional pages, it includes only (a) a LexisNexis SmartLinx Comprehensive Business Report, that lists ATI's corporate registration information and the identities of its officers; (b) a System for Award Management (SAM.gov) "Core Data" printout reflecting innocuous corporate data and the government contracts ATI obtained; and (c) links to three deeply dishonest YouTube videos

published by O'Keefe, two of which were released *after* the FAR Suspension Notice was issued (meaning they could not have contributed to the SBA's decision to suspend). *Id.* ¶¶ 121–28; *see also* **Exhibit 9**, Administrative Record with Cover E-mail. To this day, the SBA has never supplemented or amended the Administrative Record. Dkt. No. 1 ¶ 132.

Within 30 days of the FAR Suspension, ATI provided the SBA with substantial affirmative evidence that the allegations in the videos (including the two videos that post-date the FAR Suspension itself) and each of the four bases of suspension identified in the FAR Suspension Notice, were patently and demonstrably false. *Id.* ¶ 136. ATI's submission offered substantial supporting evidence of its compliant operations and confirmed that, contrary to the false statements in the FAR Suspension Notice, (1) the Tribe has at all times retained actual, effective, and legal control over ATI; (2) ATI has never acted as an illegal pass-through; (3) ATI routinely complies with subcontracting limitations applicable to 8(a) contracts; and (4) the Tribe's wholly owned tribal holding company, SFSI, has at all times retained a 51% ownership stake in ATI and benefitted proportionally from ATI's business. *Id.* ¶¶ 139–141, 144.

On December 4, 2025, Plaintiffs' counsel met with the SBA's Suspension and Debarment Official ("SDO") and its then-General Counsel and then-Deputy General Counsel to discuss the suspensions. *Id.* ¶ 148. The SDO admitted that some of the allegations in the videos were facially unbelievable, commenting that one of the more salacious allegations in particular—that a large business performed the vast majority of the work on a $100 million contract awarded to ATI but received only 35% of the payment—was not credible, because no business would willingly accept $35 million in pay for tens of millions of dollars more than that in work. *Id.* Yet despite the acknowledged absurdity of some of the allegations in the videos and a total lack of evidence of any wrongdoing, Defendant Loeffler and the SBA continued to falsely portray ATI as the poster

child for fraud in government contracting, all while publicly attacking even more companies in the 8(a) Program. *Id.* ¶ 149.

### E. The 8(a) Program Suspension Appeal

On December 8, 2025, ATI appealed its 8(a) Program Suspension to the SBA's Office of Hearings and Appeals ("OHA"), an internal SBA tribunal (the "OHA Proceeding"). *Id.* ¶ 151. Despite the SBA's obligation to produce an administrative record in the OHA Proceeding that included "every document relevant to [ATI's] termination that the SBA possessed on the date of its determination, and upon which the decision-maker and those SBA officials who recommended for or against the determination relied[,]" the OHA administrative record contained just one document: the wholly unsupported FAR Suspension Notice. *Id.* ¶ 152.

The Administrative Law Judge (the "ALJ") assigned to the OHA Proceeding recognized the utter lack of evidence to support the SBA's position. *Id.* ¶¶ 153–54; *see also* **Exhibit 10**, OHA Decision. On May 18, 2026, the ALJ issued an Order remanding the 8(a) Suspension decision back to the SBA to supplement the OHA administrative record. *Id.* ¶ 153. The ALJ found that the SBA "ma[de] no effort whatever to substantiate [the statements attributed to the O'Keefe video]" and cautioned that "uncorroborated suspicion or accusation" and "[c]onclusory statements" by a contractor's principal or employee "which raise suspicions" about improper conduct "do not amount to adequate evidence" sufficient to suspend a contractor. *Id.* ¶ 154. Unable to supplement the OHA administrative record with actual evidence, the SBA instead lifted ATI's 8(a) Suspension, commenting that the SBA "has completed a thorough review of the information . . . provided regarding [ATI's] . . . suspension from the 8(a) [Program] . . . and has lifted the 8(a) suspension" because "suspension was no longer necessary." *Id.* ¶ 156; **Exhibit 11**, Suspension Lift Notice. Four days later, ATI's counsel requested that the SBA similarly lift the FAR 9.407 Suspension (which was based on the same grounds). Dkt. No. 1 ¶ 157. The SBA refused. *Id.*

### F. Plaintiffs' Continued Efforts to End the FAR Suspensions

On July 23, 2026, Plaintiffs' counsel met with seven SBA officials: then-SBA General Counsel, Wendell Davis; then-SBA Deputy General Counsel (now General Counsel) Jennifer Prescott; SBA Deputy General Counsel and SDO John Klein; Attorney Edmund Bender; Associate General Counsel for Litigation Eric Benderson; Attorney Lane Siems; and Attorney Denise Grugan. *Id.* ¶ 158. At the meeting, Plaintiffs' counsel repeatedly requested that these officials provide any facts, evidence, events, or areas of concern that would justify an ongoing suspension. *Id.* None of these seven officials, some of whom had been involved in the suspension proceedings since the day the FAR Suspension Notice issued, were able to provide *any* examples or identify *any* areas of concern. *Id.*

The same day, Benderson promised a final decision on the lifting of the suspensions by August 5, 2026 "at the latest." *Id.* ¶ 159. The SBA missed that self-imposed deadline, then rescheduled, missed, rescheduled again, and missed again several additional self-imposed deadlines to resolve the suspension. *Id.* ¶¶ 159–63. On August 7, 2026, Benderson implied that there were career SBA employees who believed the suspensions should be lifted. *Id.* ¶ 162. However, Benderson indicated that "someone else" had gotten involved at the SBA which prevented the SBA from providing a decision. *Id.* Based on Benderson's other comments on the call, on information and belief, the "someone else" who had gotten involved to block the lifting of the suspensions is Defendant Loeffler's Chief of Staff, Wesley Coopersmith, a political appointee with no known experience in suspension and debarment matters, the 8(a) Program, or federal government contracting. *Id.*

As of October 21, 2026, a full year had passed since the SBA issued the FAR Suspension Notice to ATI and the Individual Plaintiffs, and the SBA was required to lift the suspension as a result. *Id.* ¶ 167; *see also* 48 C.F.R. § 9.407–4(b) (suspensions may not exceed 12 months except

under specific circumstances). Instead, on October 21, 2026, the SBA informed Plaintiffs that the FAR Suspension against Plaintiffs would be extended for an additional six months, citing FAR 9.407–4(b). *Id.* ¶ 173. FAR 9.407–4(b) permits a six-month extension of a suspension where "an office of a U.S. Assistant Attorney General, U.S. Attorney, or other responsible prosecuting official requests its extension, in which case it may be extended for an additional 6 months." *Id.* ¶ 174; 48 C.F.R. § 9.407–4(b). Just as there is no evidence (and there never was any evidence) to support the SBA's continued suspension, there is no evidence to justify any DOJ investigation. Indeed, on information and belief, Plaintiffs understand that the DOJ capitulated to a request from SBA personnel to issue such a request in order to create a pretext to extend the suspension period. *Id.* ¶ 175. The purported investigation is a sham: no law enforcement official has ever contacted Plaintiffs about any "investigation," and neither the DOJ nor any other "responsible prosecuting official" has made any request for information of any kind to Plaintiffs. *Id.* ¶ 40. The result is that Plaintiffs remain suspended despite no evidence supporting any such suspension.

## I. LEGAL STANDARD

Federal Rule of Civil Procedure 65 permits this Court to "issue a preliminary injunction . . . on notice to the adverse party[,]" FED. R. CIV. P. 65(a)(1), or a temporary restraining order with or without notice, FED. R. CIV. P. 65(b)(1). The purpose of injunctive relief, whether through a temporary restraining order or preliminary injunction, is to "preserve the relative positions of the parties[,]" as of the *status quo ante*, *i.e.*, "the last peaceable uncontested status existing between the parties before the dispute developed[,]" "until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Beatty v. Trump*, 834 F. Supp. 3d 41, 100–01 (D.D.C. 2026) ("A preliminary injunction . . . place[s] [parties] . . . in the *status quo ante* . . . ."); *Garcia Domingo v. Castro*, 806 F. Supp. 3d 1246, 1251 (D.N.M. 2025) ("The *status quo ante* is defined

. . . 'as the last peaceable uncontested status existing between the parties before the dispute developed.'") (quoting *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 798 n.3 (10th Cir. 2019)); *see also Bradshaw v. Veneman*, 338 F. Supp. 2d 139, 141 (D.D.C. 2004) (purpose of temporary restraining order is "to preserve the status quo and prevent imminent harm pending fuller briefing") (citing *Barrow v. Graham*, 124 F. Supp. 2d 714, 715–16 (D.D.C. 2000)).

A plaintiff seeking injunctive relief, whether through a temporary restraining order or a preliminary injunction, "must make a 'clear showing that four factors, taken together, warrant relief . . . .'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 505 (D.C. Cir. 2016)); *see also Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003) ("The same standards apply for both temporary restraining orders and preliminary injunctions.") (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)). Specifically, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). "'[W]hen the Government is the opposing party,' . . . the balance-of-equities and public-interest factors 'merge,' and courts address those factors together." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 169 (D.D.C. 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Singh v. Berger*, 56 F.4th 88, 107 (D.C. Cir. 2022)).

Prior to the Supreme Court's 2008 decision in *Winter v. Natural Resources Defense Council*, "courts in this Circuit applied a 'sliding-scale' approach to the preliminary-injunction factors, under which 'a strong showing on one factor could make up for a weaker showing on

another.'" *Id.* at 170 (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). Following the *Winter* decision, the D.C. Circuit "has repeatedly declined to decide 'whether the sliding-scale approach remains valid.'" *Id.* (quoting *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022)). However, regardless of the specific standard to be applied, "'[t]he first two factors,' likelihood of success on the merits and irreparable harm, '[remain] the most critical.'" *Streever v. Mullin*, Civil Action No. 26-2356 (RC), 2026 WL 2720475, at *10 (D.D.C. Sept. 15, 2026) (quoting *Nken*, 556 U.S. at 434). Plaintiff meets all four factors in this case, and entry of a temporary restraining order and preliminary injunction to restore the parties to the *status quo ante* and immediately lift the SBA's unlawful and unconstitutional suspensions is appropriate.

## III. ARGUMENT

### A. This Court Has Subject Matter Jurisdiction to Enter a Temporary Restraining Order and Preliminary Injunction

As a threshold matter, this Court has subject matter jurisdiction to enter a temporary restraining order and preliminary injunction against the SBA under the circumstances of this case. Plaintiffs' Complaint raises causes of action under the APA, 5 U.S.C. §§ 701–706, as well as a *de facto* debarment claim under the United States Constitution. *See generally* Dkt. No. 1 ¶¶ 186–249. The APA specifically grants a district court the authority to "compel agency action unlawfully withheld or unreasonably delayed . . . ." 5 U.S.C. § 706(1). Accordingly, this Court has subject-matter jurisdiction because this Court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, and it may compel agency action under the APA, 5 U.S.C. § 706(1).

In the past, the SBA has attempted to stave off requests for injunctive relief by invoking a provision of the Small Business Act that reads in relevant part:

> In the performance of, and with respect to, the functions, powers, and duties vested in [the Administrator,] . . . the Administrator may

> . . . sue and be sued . . . in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy; but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property . . . .

15 U.S.C. § 634(b)(1). The SBA has previously claimed that this provision deprives the Court of subject-matter jurisdiction to enter injunctive relief. *See, e.g.*, *Elk Assocs. Funding Corp. v. U.S. Small Bus. Admin.*, 858 F. Supp. 2d 1, 20 (D.D.C. 2012) (the "SBA contends that this Court is precluded from granting [plaintiff] injunctive relief by virtue of 15 U.S.C. § 634(b)(1)"). But Section 634(b)(1) is no obstacle to this Court granting injunctive relief here. The SBA's proposed "sweeping interpretation" in its prior anti-injunction advocacy "has not taken hold in this Circuit, where courts have strongly intimated that injunctive relief is available, at a minimum, when the SBA exceeds its statutory authority."[5] *Id.* (citing *Valley Forge Flag Co., Inc. v. Kleppe*, 506 F.2d 243, 245 (D.C. Cir. 1974) (per curiam); *San Antonio Gen. Maint., Inc. v. Abdnor*, 691 F. Supp. 1463, 1467 (D.D.C. 1987); *U.S. Women's Chamber of Com. v. U.S. Small Bus. Admin.*, Civil Action No. 1:04–CV–01889, 2005 WL 3244182, at *14 (D.D.C. Nov. 30, 2005)).

Moreover, the D.C. Circuit has strongly implied that an injunction may remedy the SBA's arbitrary and capricious misconduct. On this point, *Oklahoma Aerotronics, Inc. v. United States*

---

[5] In *Elk Associates*, the court went on to analyze § 634(b) at length, including by reviewing the legislative history of that provision and others from which its language appears to be derived. The Court noted that Congress "intended the anti-injunction language 'to keep creditors and others suing the government from hindering and obstructing agency operations through mechanisms such as attachments of funds,'" adding that "the idea of construing Section 634(b)(1) to grant the SBA any greater immunity from injunctive relief under the [APA] than is enjoyed by other federal agencies gives this Court pause." *Id.* at 21–22 (citations omitted). Ultimately, the Court did not need to resolve the scope of the interpretative question in that case, as the plaintiff did not satisfy the injunction factors. *Id.* For the avoidance of doubt, Plaintiffs do not seek an attachment or garnishment of SBA funds, and the relief requested would not impact the SBA's financial operations or otherwise interfere with agency functioning.

("*Oklahoma Aerotronics II*"), 661 F.2d 976 (D.C. Cir. 1981), is instructive. In *Oklahoma Aerotronics II*, the SBA terminated the plaintiff ("OAI") from participating in the 8(a) Program, committing a series of "egregious procedural errors" along the way. *Id.* at 977. In a nutshell, the SBA delivered a notice to OAI stating that the company's status as an 8(a) Program participant would end the following year because OAI was not owned or controlled by a socially or economically disadvantaged individual. *Id.*; *Oklahoma Aerotronics, Inc. v. United States* ("*Oklahoma Aerotronics I*"), Civil Action No. 78-0796, at *1 (D.D.C. June 30, 1980).[6] The SBA then repeatedly reversed course on OAI's eligibility for the 8(a) Program and, after OAI successfully appealed its termination to the Board of 8(a) Appeals, the SBA orchestrated a closed-door reconsideration that overturned the Board's ruling. *Oklahoma Aerotronics II*, 661 F.2d at 977. The SBA then terminated OAI from the program without notice or any further opportunity to be heard. *Id.*

When OAI brought suit against the SBA challenging the agency's process and decision under the APA, the district court granted summary judgment to the SBA, stating (as an alternate basis for its decision) that "the Court is without jurisdiction to entertain this action" because "section 634(b)(1) is unequivocal in its intent not to waive the SBA's immunity from suits which seek injunctive and other similar relief." *Oklahoma Aerotronics I*, at *1–2, *5. But the D.C. Circuit reversed. At the outset, it found the SBA's "arguments about sovereign immunity and injunctive relief[,]" *i.e.*, the SBA's invocation of § 634(b)(1), to be "irrelevant." *Oklahoma Aerotronics II*, 661 F.2d at 977. The Court confirmed that it was empowered to "hold unlawful and set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

[6] The district court's Memorandum Order and Judgment is not available through an online database, but a copy obtained from the National Archives is appended hereto as **Exhibit 12**.

with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)). It also found the SBA's actions were arbitrary and capricious. *Id.* And as a result, the Court entered relief akin to an injunction: "The effect of our decision is to restore OAI to its status as an incumbent in the 8(a) program." *Id.* at 978.

The D.C. Circuit's finding that § 634(b)(1) is irrelevant when a plaintiff seeks to overturn arbitrary and capricious agency action under the APA is consistent with the First Circuit's decision in *Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1057 (1st Cir. 1987). In that case, the plaintiff challenged the SBA's issuance of a certificate of competency to the low bidder on a Navy maritime contract. *Id.* at 1053–54. After trial, the district court "set aside the certificate of competency" and "remanded the matter to the Navy for consideration of the next low, responsible bid." *Id.* at 1054 (citations omitted). The district court "based its authority on the power granted" by the APA to overturn arbitrary and capricious agency action. *Id.* The SBA appealed and invoked § 634(b)(1). *Id.* at 1055. The First Circuit affirmed the district court's decision, finding that "[e]ven if the order of the district court against [the] SBA is interpreted as equivalent to an injunction, 15 U.S.C. § 634(b)(1) does not bar judicial review of the actions of the SBA in this case." *Id.* at 1056. The Court explained:

> The origin and purpose of the language in § 634(b)(1) goes back to the decision in *FHA v. Burr*, [309 U.S. 242, 245–46 (1940)], which held that when Congress established an agency that was authorized to engage in business transactions and permitted it to "sue and be sued" (as is true of the SBA), this waiver extended to all civil processes incident to suit such as garnishment and attachment of the agency's assets. Therefore, language such as that in § 634(b)(1) was added to enabling statutes to bar the attachment of agency funds and other interference with agency functioning. [ ] The no-injunction language . . . does not provide blanket immunity from every type of injunction. *In particular, it should not be interpreted as a bar to judicial review of agency actions that exceed agency authority where the remedies would not interfere with internal agency operations*.

*Id.* at 1056–57 (emphasis added).[7]

In short, the anti-injunction provision does not prevent this Court from overturning the SBA's arbitrary and capricious mistreatment of Plaintiffs here. Similar to *Oklahoma Aerotronics II*, the SBA acted hastily to suspend Plaintiffs without justification and engaged in a series of severe procedural irregularities in its efforts to keep Plaintiffs shut out from all government contracting—including by ignoring the bases of the OHA ALJ's ruling on the 8(a) Suspension and leaving the equally defective FAR Suspensions in place. These are the very kind of egregious procedural errors that caused the D.C. Circuit to lift OAI's 8(a) termination in *Oklahoma Aerotronics II*, 661 F.2d at 977. This Court should enter similar injunctive relief here.

Plaintiffs seek relief similar to the relief sought—and obtained—in *Oklahoma Aerotronics II*, specifically an Order requiring the SBA to lift the suspensions of all Plaintiffs and prohibiting actions that constitute *de facto* debarment from federal contracting. *Cf. id.* at 978 ("The effect of our decision is to restore OAI to its status as an incumbent in the 8(a) program."). This Court has subject matter jurisdiction to do so.[8]

---

[7] Along similar lines, in *Camelot Banquet Rooms, Inc. v. SBA*, 458 F. Supp. 3d 1044, 1052 (E.D. Wis. 2020), the court commented on the absurdity of a finding that the anti-injunction language prevents injunctions against the SBA under all circumstances: "Indeed, if provisions such as § 634(b)(1) meant that the agency could never be enjoined, then an agency could adopt unconstitutional policies and continue to follow them even after a court declared them unconstitutional."

[8] *See DACO Invs., LLC v. U.S. Small Bus. Admin.*, Case No. 6:22-CV-01444, 2024 WL 750594, at *5–6 (W.D. La. Feb. 22, 2024) ("the Small Business Act's prohibition against ordering injunctive relief against the SBA does not preclude this Court from vacating the First [Interim Final Rule] if that rule is found unlawful under the APA"); *Elizabeth Grady Sch. of Esthetics & Massage Therapy v. Cardona*, Civil Action No. 23-cv-12461-ADB, 2023 WL 8477854, at *5 (D. Mass. Dec. 7, 2023) ("the Court finds that it has jurisdiction to consider whether Plaintiffs are entitled to aspects of their requested relief under its APA claim" including "whether, under the APA, Defendant should be . . . enjoined from terminating the Plaintiffs' participation in Title IV, and . . . ordered to continue Plaintiffs' eligibility to participate in Title IV programs . . . ."); *Widerman Malek P.L. v. Carranza*, Case No. 6:20-cv-665-Orl-37GJK, 2020 WL 6748083, at *2–3 (M.D. Fla. June 22, 2020) ("the

### B. This Court Should Enter a Temporary Restraining Order and Preliminary Injunction Compelling the SBA to Lift Plaintiffs' Suspension

#### 1. Plaintiffs Are Likely To Prevail on the Merits

Plaintiffs are likely to prevail on the merits of both their APA claims, Dkt. No. 1, Counts 1–4, and their constitutional claim, *id.*, Count 5. If the Court determines that Plaintiffs are likely to succeed on any of their five claims against Defendants, then the likelihood of success prong is satisfied. *Media Matters for Am. v. FTC*, 805 F. Supp. 3d 105, 119 (D.D.C. 2025) ("And a plaintiff 'need only establish a likelihood of success on the merits of one claim to obtain . . . injunctive relief.'") (quoting *A.B.-B. v. Morgan*, 548 F. Supp. 3d 209, 218 (D.D.C. 2020)).

##### a. Plaintiffs Are Likely To Prevail on their APA Claims

There is no doubt that the administrative state "wields vast power and touches almost every aspect of daily life . . . ." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 499 (2010). For government contractors like ATI, that "vast power" is existential. Administrative agencies run the federal programs—like the 8(a) Program—that make it possible for these companies to thrive. On the other hand, they can also take adverse actions—like issuing suspensions—that functionally destroy the same companies. In short, the agency giveth, and the agency taketh away.

Thankfully, that power is not absolute; the APA provides a critical set of guardrails to cabin that expansive administrative power and prevent agency abuses. "It requires courts to 'hold unlawful and set aside agency action, findings, and conclusions' that are 'arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law.'" *Remmie v. Mabus*, 898 F. Supp. 2d 108, 115 (D.D.C. 2012) (quoting 5 U.S.C. § 706(2)(A)). To withstand judicial scrutiny, before

---

Court can enjoin the SBA when the Administrator exceeds her authority or uses her discretion arbitrarily and capriciously" and to shield the SBA "against injunctive relief in every circumstance yields an unjust and untenable result.").

an agency takes action, it must first "examine the relevant data," and upon taking action, must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Similarly, an agency cannot reach decisions that "run[] counter to the evidence before" them or make "implausible" decisions "that . . . could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Defendants utterly failed to meet even the APA's modest standard for agency conduct. The SBA did not "examine the relevant data" to determine whether a suspension was warranted, nor has it ever "articulate[d] a satisfactory explanation for its action[.]" *Id.* Instead, the agency credulously accepted the musings of a career internet provocateur—without *any* corroboration—and relied on his heavily manipulated YouTube content as the sole basis for suspending Plaintiffs indefinitely, effectively shuttering their business operations. Dkt. No. 1 ¶¶ 119–127. Worse still, upon issuing the suspensions, the agency stuck its head in the sand, refusing to reconsider its suspension decisions even after Plaintiffs provided troves of materials conclusively refuting the accusations leveled in O'Keefe's videos, met with SBA officials on several occasions to address their concerns, and obtained a ruling from an OHA judge admonishing the SBA that the 8(a) Suspension—based on the same grounds as the FAR Suspension—lacked substantial evidence, and that suspension based on uncorroborated allegations would be arbitrary and capricious. *Id.* ¶¶ 31–34, 36, 136, 145–49, 151–66; Exh. 10 at 12–13. The SBA continues to maintain Plaintiffs' suspensions despite that decision "run[ning] counter to" all of the evidence before the agency, rendering the SBA's decision-making wholly implausible. *Motor Vehicle Mfrs.*, 463 U.S. at 43.

The SBA's conduct here is exactly the kind of abuse of agency power that the APA requires

courts to correct. As this case demonstrates, suspending a government contractor can yield grievous consequences for the impacted company and its employees, sometimes amounting to a corporate death penalty. The APA rightfully requires that such consequential action must result from a sober, reasoned process that rationally considers the facts and applies the law. That did not happen here. Indeed, Defendants' decision to suspend ATI emerged as a kneejerk reaction to a salacious YouTube video made by a political compatriot of the current administration. The law requires more.

**i. The Suspensions Do Not Rest on Adequate Evidence**

The core defect underlying the SBA's decision to suspend Plaintiffs is the sheer lack of evidence to support the agency's actions. A FAR suspension is valid only if it is based on "adequate evidence." 48 C.F.R. § 9.407–2(a). For more than fifty years, the D.C. Circuit has reaffirmed that the "adequate evidence" standard requires "more than uncorroborated suspicion or accusation." *Sloan v. Dep't of Hous. & Urb. Dev.*, 231 F.3d 10, 16 (D.C. Cir. 2000) (quoting *Horne Bros., Inc. v. Laird*, 463 F.2d 1268, 1271 (D.C. Cir. 1972)). The FAR confirms that the "adequate evidence" upon which a suspension is based must be set forth in the administrative record underlying the suspension, "including any submission made by the contractor . . . ." 48 C.F.R. § 9.407–3(d)(1).[9]

In an attempt to portray at least superficial compliance with the regulations, in its FAR Suspension Notice, the SBA represented (incorrectly) that the suspension was issued "[u]pon adequate evidence," Exh. 1 at 2, and instructed that "[t]his suspension action has been initiated on the basis of the administrative record. A copy of the record, except for those materials protected

[9] Notably, where a contractor's response raises a genuine dispute over material facts, "additional proceedings to determine disputed material facts *will* be conducted . . . ." 48 C.F.R. § 9.407–3(c)(6) (emphasis added). The SBA provided no such "additional proceedings" here, rendering the SBA's initial suspension decision and ongoing failure to lift the same contrary to law.

from disclosure, will be furnished upon request," *id.* at 4.

When ATI requested the administrative record, it received this email in reply:

> **From:** Bender, Edmund <Edmund.Bender@sba.gov>
> **Sent:** Wednesday, November 19, 2025 4:17 PM
> **To:** Matt Feinberg <mfeinberg@pilieromazza.com>
> **Cc:** Klein, John W. <john.klein@sba.gov>
> **Subject:** [EXTERNAL EMAIL] Administrative record - ATI Government Solutions LLC
>
> Dear Matt,
>
> As requested, please find the administrative record for the Notice of Suspension issued to ATI Government Solutions LLC on October 21, 2025. In addition to the attached documents, SBA's suspension is based on the following videos produced by the O'Keefe Media Group:
>
> 1. "Pass-Throughs", "Shell-Companies", & $100 Billion Federal Contracting Scam | O'Keefe Media Group
> 2. BREAKING: ANOTHER Federal Contractor Admits to $100M Fraud & Outsourcing to Accenture
> 3. CONFRONTING Former ATI Employee Who Exposed MILLIONS in Government Contract Fraud
>
> Regards,
> Ed

The only documents attached to Bender's November 19, 2025 email were a completely innocuous SAM.gov printout and a Lexis report. Exh. 9. That leaves nothing more than the three obviously-edited and deceptively narrated O'Keefe YouTube videos as the entire basis for the suspensions. *Id.* But it gets worse: two of those three videos *had not yet been published* on the date of ATI's suspension, and upon request, the SBA confirmed to Plaintiffs' counsel that it did not obtain the videos in advance of their publication dates, making it impossible that those two videos actually formed the basis of ATI's suspension. **Exhibit 13**, E-mail from Bender to Feinberg, Nov. 20, 2025 ("Our office did not receive direct video footage. We accessed the videos through YouTube."). What remains is a single, uncorroborated YouTube video as the only piece of "evidence" to support the suspensions. More than a year after its initial suspension, the SBA still has never supplemented its administrative record. Dkt. No. 1 ¶ 132.

The FAR establishes the parameters for what constitutes "adequate evidence" to support a suspension. And the SBA's "evidence" here falls well short. Under FAR 9.407–1(b)(1): "In

assessing the adequacy of the evidence, agencies should consider how much information is available, how credible it is given the circumstances, whether or not important allegations are corroborated, and what inferences can reasonably be drawn as a result." The agency's "assessment should include an examination of basic documents such as contracts, inspection reports, and correspondence." *Id.* And the agency must consider credibility of the available evidence and "look for corroboration . . . ." *Inchcape Shipping Servs. Holdings Ltd. v. United States*, No. 13-953 C, 2014 WL 12838793, at *2 (Fed. Cl. Jan. 2, 2014). The adequate evidence standard has been likened to the probable cause standard in criminal litigation. *Horne Bros.*, 463 F.2d at 1271. The SBA failed at every turn here.

The single piece of "evidence" on which the SBA suspended Plaintiffs features substantial indicia of unreliability. The video[10] is clearly heavily edited, with short snippets of conversations posted out of context and supplemented by the narrator's, O'Keefe, personal commentary—far from the paragon of reliability. *See Guillory v. Dalbour*, Civil Action No. 2:15-cv-02452, 2016 WL 5415072, at *6 (W.D. La. Sept. 27, 2016) (if video tape is "'clearly spliced' . . . the tape may not have supported the judge's probable cause finding . . . ."). Beyond the fact that the video was obviously and heavily edited, the SBA made no effort to determine if the employee had—or would have had, given her administrative role—personal knowledge of the relevant facts (she did not). The employee's name does not appear on the corporate reports the SBA included in the record, indicating she did not hold a position of importance such that the SBA could assume she had

[10] The one YouTube video that was both (a) identified by the SBA as part of the administrative record underlying ATI's suspension, and (b) actually in existence at the time that the suspension issued, is available here: https://www.youtube.com/watch?v=B_CtRCLaSbY&t=63s. Even if the SBA could retroactively base its suspension on the two videos that did not exist at the time that it issued the suspension, it would fare no better. These videos are equally unreliable; they are available here: https://www.youtube.com/watch?v=KKLNbz4yRvM&t=1s; and here: https://www.youtube.com/watch?v=F5jX4zE_IR0.

personal knowledge or the authority to speak for the company (again, she did not). Exh. 9. And O'Keefe *admitted in the video* that he lied to the employee to convince her to speak with him. Simply put, the video lacks any indicia of reliability and credibility. The SBA did not seek out corroboration, nor did it examine "basic documents such as contracts, inspection reports, and correspondence." *Inchcape Shipping Servs. Holdings*, 2014 WL 12838793, at *2; 48 C.F.R. § 9.407–1(b)(1). It was required to do both. Tellingly, the SBA did not even ask ATI for its response to the video.

Where an agency's action rests on uncorroborated material that "was not such relevant evidence as a reasonable mind might accept to support a conclusion[,]" the action is "not supported by substantial evidence and . . . invalid." *Jacobowitz v. United States*, 424 F.2d 555, 562–63 (Ct. Cl. 1970). Even affording due deference to the SBA's decision-making process, "a record devoid of support" for the agency's decision cannot suffice to uphold its action. *Whirlpool Corp. v. Occupational Safety & Health Rev. Comm'n*, 645 F.2d 1096, 1101 (D.C. Cir. 1981). No reasonable mind could conclude that the YouTube video identified by the SBA is sufficient, *in light of its substantial lack of credibility and without anything more*, to justify Plaintiffs' suspension.

Unsurprisingly, the one neutral decisionmaker to scrutinize the SBA's suspension decision —the ALJ in the OHA Proceeding—expressed serious doubt about the SBA's conduct and the propriety of the decision. Exh. 10 at 10–14. The OHA Proceeding concerned the SBA's separate, now-lifted suspension of ATI as a participant in the 8(a) Program based on the same four grounds for suspension. Exh. 1; Exh. 2. In the OHA Proceeding, the SBA did not even attempt to substantiate its stated suspension grounds. Instead, it relied on a single document: the FAR Suspension Notice. Exh. 10 at 4. The ALJ chastised the SBA for its position, determining that

the FAR Suspension Notice was not, in reality, the basis of the 8(a) suspension, but that it was instead being used as an impermissible "*post hoc* rationalization" for a suspension that was *actually* issued because of "statements made by [ATI's] employee," a reference to the contents of the O'Keefe video. *Id.* at 11 (citing *Matter of R.A. Quarshie & Assoc., Inc.*, SBA No. BDPE-605, 2022 WL 17076952, at *21 n.2 (Nov. 1, 2022)). The ALJ found that the SBA "ma[de] no effort whatever to substantiate [the statements attributed to the O'Keefe video] . . . ." *Id.* at 11; Dkt. No. 1 ¶ 154. The ALJ also cautioned the SBA that "uncorroborated suspicion or accusation" and "[c]onclusory statements" by a contractor's principal[11] "which raise suspicions" about improper conduct "do not amount to adequate evidence" sufficient to suspend a contractor. Exh. 10 at 8, 14. Since the SBA failed to provide any evidence pertaining to the employee's statements in the administrative record underlying the 8(a) Suspension, the ALJ remanded the matter to the SBA to supplement the record. *Id.* at 12. The SBA could not do so (because no such evidence existed). Accordingly, on June 4, 2026, instead of providing supporting evidence for its suspension, the SBA lifted the 8(a) Suspension altogether, announcing that "suspension was no longer necessary." Dkt. No. 1 ¶ 156; Exh. 11. But even then, the SBA did not truly back down from its unsupported and harmful actions, maintaining the FAR suspension despite any evidence to justify it.

The barren administrative record underlying Plaintiffs' FAR suspensions is entirely unlikely to survive judicial scrutiny. It reflects no audit, no genuine investigation, and no contact with any of the Plaintiffs (or anyone else, for that matter) before the suspension issued. *See generally* Exh. 9. Indeed, as set out above, the SBA failed to comply with the FAR's instructions

[11] For avoidance of doubt, the former ATI employee that appeared in O'Keefe's video was, at no time, the "firm's principal," making her conclusory statements even less plausible than those previously rejected by the SBA as a basis for suspension. *See* Exh. 10 at 14 (citing *Matter of Alliance Steel Constr., Inc.*, SBA BDP-186, 2002 WL 32988164, at *8–9 (Dec. 12, 2002)).

for how to evaluate adequate evidence. 48 C.F.R. § 9.407–1(b)(1). More than a year after ATI's FAR Suspension first issued, the administrative record remains unchanged, unimproved, empty. Dkt. No. 1 ¶ 132. In a meeting between the SBA and ATI's counsel on July 23, 2026, none of the seven SBA officials in attendance—several of whom had been involved in the suspension proceeding since the date of issuance of the FAR Suspension Notice—were able to identify a single fact, piece of evidence, event, or area of concern that would justify an ongoing suspension. *Id.* ¶ 158. The paucity of evidence, and the SBA officials' inability to justify the suspension, leaves no doubt that the suspension is unsupported by adequate evidence, is arbitrary and capricious, and constitutes an abuse of the agency's discretion, and the continuation of the suspension despite a total lack of evidence is contrary to law (including, specifically, FAR 9.407–1(b)(1), requiring that a suspension may stand only upon "adequate evidence" contained in the administrative record).

**ii. The SBA Improperly Failed to Consider Exonerating Evidence**

Agency action is arbitrary and capricious where the agency "entirely failed to consider an important aspect of the problem it faces," *SecurityPoint Holdings, Inc. v. Transp. Sec. Admin.*, 769 F.3d 1184, 1187 (D.C. Cir. 2014) (internal citations and quotation marks omitted), or "offer[s] an explanation for its decision that runs counter to the evidence before the agency," *Motor Vehicle Mfrs.*, 463 U.S. at 43, and its explanation for its decisions "'must be one of reasoning; it must not be just a conclusion[,]'" *SecurityPoint Holdings*, 769 F.3d at 1187–88 (quoting *Butte County, Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)). An agency action that is "not based on all relevant evidence" "'is the essence of arbitrariness . . . .'" *Friedler v. Gen. Servs. Admin.*, 271 F. Supp. 3d 40, 62 (D.D.C. 2017) (quoting *Sterlingwear of Bos., Inc. v. United States*, 11 Cl. Ct. 879, 889 n.7 (1987)). The D.C. Circuit has explained:

> [A]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706. [ ] This proposition may be deduced from case law applying

> the substantial evidence test, under which an agency cannot ignore evidence contradicting its position. "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."

*Hogen*, 613 F.3d at 194 (first citing *Motor Vehicle Mfrs.*, 463 U.S. at 43; then citing *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009); then quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88 (1951)); *see also Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 394 (D.D.C. 2015) (agency action is arbitrary and capricious where "the agency has 'ignore[d] evidence contradicting its position . . . .'") (citations omitted).

It is apparent from the Administrative Record that the SBA failed to consider any evidence already within its possession when it decided to suspend Plaintiffs. The SBA should have considered, for example, the Tribal Management Development Plan that ATI submitted with its 8(a) application, which set out the company's plan for how to resolve the mismatch between the company's pressing business needs and the expertise and management experience then possessed by the members of the Tribe. Dkt. No. 1 ¶¶ 80–91. The Tribal Management Development Plan runs squarely counter to O'Keefe's invented narrative, explaining ATI's rationale for its staffing decisions and its plans to create and promote increased opportunities for tribal members within the organization without compromising the company's short-term performance as a source of revenue for the Tribe. *Id*. Not only was the evidence in the SBA's possession, but the SBA actually blessed the Tribal Management Development Plan in 2019 in the course of approving ATI's 8(a) certification. *Id.* ¶¶ 81–84. Yet it apparently did not see fit to review, or include in the Administrative Record, the Tribal Management Development Plan when it made the determination to issue ATI's suspension. Exh. 9.

The SBA also had, in its possession, ATI's annual 8(a) certification documents showing its financial dealings and confirming its compliance with the SBA's 8(a) regulations. Under SBA

regulations, an 8(a) Program participant must submit to the SBA, on an annual basis, "audited annual financial statements prepared by a licensed independent public accountant . . . ."[12] 13 C.F.R. § 124.602(a). ATI's audited financial statements, submitted to the SBA in advance of the suspension decision, of course include ATI's distributions to SFSI in accordance with ATI's SBA-approved Operating Agreement. **Exhibit 14**, Decl. of Matthew E. Feinberg ¶ 8. Furthermore, the SBA had in its possession ATI's annual reports on the benefits provided to the Tribe from ATI's operations, pursuant to 13 C.F.R. § 124.604. If the SBA had considered any of this evidence, the overwhelming weight of such evidence would have directly refuted the allegations in the video and would not have supported a suspension.

The agency similarly disregarded the myriad public-record evidence that the creator of the YouTube videos underlying the suspension is a politically-motivated serial fabulist with a decades-long record of making spurious claims against his perceived political opponents supported by heavily manipulated undercover video footage. James O'Keefe is a known quantity; the narratives advanced in his videos are routinely debunked, and he has faced significant, repeated scrutiny in civil and criminal proceedings since at least 2010. *See* Dkt. No. 1 ¶ 60 & n.9 (citing a non-exhaustive list of civil and criminal penalties and settlements resulting from O'Keefe's "investigations"). The agency's uncritical acceptance of his videos as definitive proof of wrongdoing by ATI constitutes an abject failure to ensure that any suspension was founded on *reliable evidence*, not mere allegations made by a political provocateur.

And when ATI came forward with *actual* evidence to set the record straight within 30 days of the issuance of the FAR Suspension Notice, the SBA ignored it. ATI provided financial records,

[12] Tribally-owned companies may submit unaudited financial statements, along with audited financial statements of the parent company, plus a certification as to the accuracy of the statements. 13 C.F.R. § 124.602(a)(1). However, ATI submitted audited financial statements.

corporate governing documents, meeting minutes from SFSI Board meetings, corporate resolutions, sworn declarations, evidence of direct tribal benefit, and limitations on subcontracting/performance of work calculations, among many other types of evidence. Exh. 14 ¶ 8. And each time that the SBA requested information from ATI thereafter, purportedly in furtherance of its "investigation," ATI complied, ultimately providing over 12,500 pages of documentation. *Id.* ¶ 6; Dkt. No. 1 ¶ 145. After submitting to the SBA's repetitive requests for nearly a year, Exh. 14 ¶ 6, ATI's counsel and seven SBA officials met on July 23, 2026 for the above-referenced meeting, during which the SBA officials could not identify a single fact justifying the suspensions, Dkt. No. 1 ¶ 158. The SBA then made *and broke* a number of promises to resolve the suspension by various dates certain, apparently at the behest of a political appointee with no experience with the 8(a) Program or suspension and debarment proceedings. *Id.* ¶¶ 159–63. The SBA then followed its final missed deadline with a lengthy and broad request for irrelevant and duplicative documents, nothing more than a delay tactic to push the suspensions out as far as possible. *Id.* ¶¶ 164–66. By then it was clear that the SBA was not investigating ATI for potential wrongdoing—it was fishing for *post hoc* rationalizations to maintain its unlawful suspensions. Yet even that fishing expedition failed to land a bite, as the SBA still cannot provide a fact-based justification for the suspensions.

The SBA's suspensions did not arise from a review of "all relevant evidence" in the SBA's custody. They resulted from the agency's decision to seize on O'Keefe's YouTube content, willfully ignoring all evidence that countered his defamatory narrative about ATI. That is the very essence of arbitrariness and confirms that the suspension was not based on "substantial evidence." *See Hogen*, 613 F.3d at 194 ("'in their application to the requirement of factual support the substantial evidence test and the arbitrary or capricious test are one and the same.'") (quoting *Ass'n*

*of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683 (D.C. Cir. 1984)).

**iii. The SBA's Differential Treatment of Plaintiffs vis-à-vis Other Government Contractors is Arbitrary, Capricious, and Contrary to Law**

Beneath the surface of the SBA's procedural violations lies an even more troubling problem: the agency's motivation for targeting ATI and 8(a) contractors in particular. The Administrative Record—and, indeed, Defendant Loeffler's public statements—are crystal clear that the impetus for the FAR suspension was O'Keefe's political hit piece. In seizing on the O'Keefe videos, Defendant Loeffler proclaimed her belief that the 8(a) Program is "rooted in DEI" and therefore must necessarily be "rife with grift and fraud."

**Kelly Loeffler** @SBA_Kelly

SBA has launched an investigation into ATI Government Solutions and Susanville Indian Rancheria.

This is why we have been conducting a full review of the 8(a) Program, ostensibly designed to help "socially and economically disadvantaged" small businesses compete in the federal marketplace. Yet, what we've discovered so far has been institutionalized abuse, which potentially amounts to billions of dollars in federal contracts that are run through shell companies, fraudulent pass-throughs, and other schemes.

That's why in February, the SBA took immediate action to slash 8(a) contracting goals across the federal government. In June, we launched an audit of the program to review every 8(a) contract for the last 15 years. And in July, we rescinded the contracting authority of USAID, which was involved in a massive bribery scandal.

@JamesOKeefeIII has exposed an important truth. Like every other government program rooted in DEI, the 8(a) Program is rife with grift and fraud.

Under my leadership, the SBA is committed to restoring integrity and implementing strong reforms to protect U.S. taxpayers from further abuse. The full audit is ongoing and whistleblowers may contact sbax.sba.gov/oigcss/

> **James O'Keefe** @JamesOKeefeIII · Oct 20, 2025
>
> $100 Billion Federal Contracting Scam Exposed: 8(a) Firm Admits to Violating Federal Law, Using Minority-Owned Status as a Front to Obtain $100M+ No-Bid Government Contracts While Outsourcing 80% of the Work.
>
> ATI Government Solutions Contract Manager, Melayne Cromwell Admits to...




6:18 PM · Oct 20, 2025 · **2.1M** Views

Defendant Loeffler pounced on the story to announce her "investigation" within *hours* of O'Keefe's first video about ATI, and suspended ATI *the next day*. Exh. 1. That is not the reasoned judgment of a responsible steward of a government agency—it is a political attack on lawful, rule-following participants in a congressionally-authorized program.

As Plaintiffs' suspensions were spurred by the political considerations of the SBA Administrator rather than from a dispassionate assessment of the evidence before the agency, it is perhaps unsurprising that their treatment differs greatly from other similarly situated government contractors across the last several decades. In particular, Plaintiffs are aware of no other example of the SBA suspending a government contractor on the basis of nothing more than unsubstantiated third-party allegations, without providing any opportunity to the suspended entities to answer questions or provide countervailing evidence to the agency in advance. To the contrary, there are numerous instances of allegations of wrongdoing against government contractors involving similar topics on which the SBA suspended ATI where the SBA did not suspend the contractor;[13] indeed,

[13] For instance, on March 23, 2023, the DOJ announced a False Claims Act settlement with Advanced Systems Technology & Management, Inc. ("AdSTM") resolving allegations that a contractor used alter ego companies to obtain 8(a) Program set-aside contracts for which AdSTM was not eligible. *See* U.S. DEP'T OF JUST., *Government Contractor Pays $742,500 to Settle False Claims Act Allegations in Obtaining Contracts Reserved for Eligible Small Businesses*, Mar. 23, 2023, available at https://www.justice.gov/usao-edva/pr/government-contractor-pays-742500-settle-false-claims-act-allegations-obtaining (last visited Oct. 29, 2026). A search of current and legacy exclusion records in SAM.gov reveals no indication that AdSTM was ever suspended or debarred from federal contracting. Exh. 14 ¶ 14(a). Furthermore, evidence from USASpending.gov indicates AdSTM received contract and task order awards during and after the underlying investigation. *Id.* Plaintiffs' counsel also identified False Claims Act settlements related to alleged abuse of the 8(a) Program for Caddell Construction (2013) and Okland Construction Co. (2014). *Id.* ¶¶ 14(c), (d). Counsel's search in SAM.gov and USASpending.gov returned no evidence of any suspension or debarment. *Id.* Instead, each contractor received consistent contract awards in the fiscal years surrounding their False Claims Act settlements. *Id.* Caddell Construction, for instance, received over $800 million in contract awards during Fiscal Years 2011, 2012, and 2013. *Id.* ¶ 14(c). In another telling example, on February 23, 2022, the DOJ announced the then-largest small business fraud settlement in history to resolve allegations

that is the norm. Exh. 14 ¶¶ 15–16. The SBA does not explain how ATI's situation is different than its prior treatment of contractors in similar circumstances.

"It is axiomatic that an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." *Kreis v. Sec'y of Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005) (internal citations and quotation marks omitted); *see also Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005) ("Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld.") (citations omitted). Accordingly, "decisions featuring unjustifiable bias or partisanship are precisely the types of agency actions that 'would work a violation of the arbitrary-and-capricious standard.'" *Level the Playing Field v. Fed. Election Comm'n*, 961 F.3d 462, 464 (D.C. Cir. 2020) (quoting *Hagelin v. Fed. Election Comm'n*, 411 F.3d 237, 243 (D.C. Cir. 2005)). As the Supreme Court put it,

> [o]ur review is deferential, but we are "not required to exhibit a naiveté from which ordinary citizens are free." [ ] The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise. If judicial review is to be more than an

---

against TriMark USA, LLC, TriMark Gill Marketing, and TriMark Gill Group, Inc., as well as company executive Kimberly Rimsza, arising out of the Service-Disabled Veteran-Owned Small Business Program. *See* U.S. DEP'T OF JUST., *Government Contractor Agrees to Pay Record $48.5 Million to Resolve Claims Related to Fraudulent Procurement of Small Business Contracts Intended for Service Disabled Veterans*, Feb. 23, 2022, available at https://www.justice.gov/usao-edwa/pr/government-contractor-agrees-pay-record-485-million-resolve-claims-related-fraudulent (last visited Oct. 29, 2026). The DOJ press release announcing the settlement indicated that the TriMark parties admitted certain allegations supporting the DOJ's fraud claims. *Id.* Yet records in SAM.gov indicate that the SBA did not suspend or debar any of the TriMark corporate parties or Rimsza. Exh. 14 ¶ 14(b). Further, USASpending.gov indicates that the TriMark companies, then operating under the name "Gill Group, Inc." received as many as 374 federal contracts or task orders in Fiscal Years 2022 and 2023. *Id.*

> empty ritual, it must demand something better than the explanation offered for the action taken in this case.

*Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). Defendant Loeffler's public pronouncements, the paper-thin administrative record, and the timing of O'Keefe's video and the SBA's suspensions all point in the same direction: ATI and the other Plaintiffs are not the subjects of a good faith SBA review, they are the targets of a brazen political attack. The Court need not, and should not, close its eyes to the barely-disguised political considerations underlying the SBA's decision. The agency's disparate treatment of Plaintiffs as participants in a congressionally-approved program that agency leadership derides as "DEI" is arbitrary and capricious and is contrary to the agency's own requirement that it base any suspension on adequate evidence.

**b. Plaintiffs are Likely to Prevail on Their Constitutional Claim**

Separate from their APA claims, Plaintiffs are likely to prevail on their due process challenge to the SBA's suspensions. The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. Among the liberty interests protected by the Due Process Clause is a government contractor's interest in being free from the stigmatizing effects of a suspension, particularly where the suspension is premised on accusations of dishonesty and fraud, without being afforded an opportunity to clear its name. *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 963 (D.C. Cir. 1980). "An agency may not impose even a temporary suspension without providing the 'core requirements' of due process: adequate notice and a meaningful hearing." *Com. Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 6 (D.C. Cir. 1998) (citations omitted). The practical or effective blacklisting of a government contractor by a government agency without due process—including adequate notice and a meaningful hearing—constitutes *de facto* debarment. *Phillips v. Mabus*, 894 F. Supp. 2d 71,

81 (D.D.C. 2012).

In this regard, *Art-Metal USA, Inc. v. Solomon*, 473 F. Supp. 1 (D.D.C. 1978), is analogous and compelling. In that case, Art Metal contracted with the General Services Administration. *Id.* at 2–3. During the relevant time period, both the Washington Post and the Washington Star published articles critical of both GSA and Art Metal, claiming that Art Metal failed to meet agency specifications, provided inferior products, and abused contract dealings with GSA. *Id.* at 3. Around the same time, Art Metal received a contract award from GSA and was lined up for additional imminent awards. *Id.* But, instead of fulfilling those procurements, GSA terminated the awarded contract and held the anticipated contracts in abeyance. *Id.* Art Metal sued under the APA and sought a temporary restraining order to prohibit GSA's *de facto* suspension and debarment. *Id.* The court granted Art Metal leave to take discovery, and depositions revealed that GSA's decision-making was based on the news articles implicating Art Metal, despite a GSA official admitting that GSA "had nothing in [its] files to substantiate" the allegations in them. *Id.* at 7. Even against this record, GSA opposed the temporary restraining order, arguing that an investigation of Art Metal was ongoing, which justified withholding contracts until that investigation was complete. *Id.* at 6.

The court rejected GSA's arguments. First, it noted that the suspension of Art Metal's contracts "was tantamount to the suspension of the company." *Id.* at 5. Then, the court found that GSA had "blacklisted [Art Metal] in violation of the law and [the agency's] own regulations. *Id.* at 7. As to the propriety of implementing a *de facto* suspension or debarment based on news articles without substantiation, the court held that actual evidence is required; "absent a factual basis in the record, the Court will not allow the government to hide behind the cloak of conclusory terms . . . to justify its actions." *Id.* at 6. The discovery record showed the primary concern for

GSA was "public relations," not any demonstrated wrongdoing by Art Metal. *Id.* at 7. The pendency of an ongoing investigation into Art Metal was insufficient to justify GSA's misconduct; as the court noted: "An investigation may have been in progress ever since June, but after almost four months GSA has yet to develop sufficient evidence to so much as inform Art Metal of its alleged wrongdoing." *Id.* On that point, the court explained: even to the extent "the Court is willing to assume that, although the regulations do not so provide, it may be lawful in exceptional circumstances to suspend a contractor temporarily pending an investigation[,] . . . the exception is a narrow one . . . ." *Id.* at 6. "[A] departure from the regulatory requirements may be countenanced only in extreme situations such as those involving national security, and then only for a limited time." *Id.* (citing *Horne Bros.*, 463 F.2d at 1271–73) (while temporary suspension may be permissible under certain circumstances, such suspension ordinarily cannot "exceed one month"). The court granted the temporary restraining order "enjoin[ing] further unlawful acts of debarment" and "restrain[ing] [GSA] from perpetuating its prior unlawful acts of debarment." *Id.* at 8.

A more analogous case would be difficult to find. Here, the SBA suspended ATI solely based on sensationalized social media videos and nothing else. After O'Keefe released his first YouTube video about ATI in October 2025, Defendant Loeffler wasted no time in painting the company—an established, well-regarded government contractor with an unblemished regulatory record and commendations for its honesty, integrity, and transparency—as a participant in fraud and abuse. It took the SBA, at Defendant Loeffler's direction, only one day to issue its FAR Suspension against ATI after the O'Keefe video was released (even during a Government shutdown). Exh. 1. At no point before the suspensions did the SBA contact Plaintiffs for comment, questions, or requests for documents or evidence, nor did it provide Plaintiffs with any forum to hear and challenge the allegations they faced. This shoot-first and ask-questions-later

philosophy of agency power is antithetical to the Constitution's due process guarantee. *See McCabe v. Barr*, 490 F. Supp. 3d 198, 223 (D.D.C. 2020) ("'The essential requirements of due process' . . . 'are notice and an opportunity to respond.'") (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)). Defendants branded Plaintiffs as fraudulent actors to the public and instantaneously suspended their ability to do business as government contractors, all without providing Plaintiffs prior notice or any opportunity to be heard. That is textbook *de facto* debarment, even worse than GSA's misconduct in *Art-Metal*. Only an injunction restraining the SBA from maintaining its baseless suspensions, and barring the agency from persisting in its unjust, disparate treatment of Plaintiffs, can remedy this wrong.

SBA cannot save itself from its own misconduct through offering post-suspension process. Pre-deprivation process must include a *meaningful* opportunity to be heard—that means an opportunity given "'at a meaningful time and in a meaningful manner.'" *Propert v. Dist. of Columbia*, 948 F.2d 1327, 1331–32 (D.C. Cir. 1991) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). To satisfy the "meaningful time" requirement, ordinarily, an opportunity to be heard should *precede* government action. *Old Dominion Dairy Prods.*, 631 F.2d at 966. The D.C. Circuit has made clear that where the deprivation of a protected interest precedes any process, the government cannot ordinarily invoke after-the-fact process to retroactively save itself from constitutional scrutiny. *Id.* And while courts have held that, in rare circumstances, it may be appropriate for government agencies to temporarily suspend contractors for a short period of time prior to providing an opportunity to be heard, such a pre-process suspension can ordinarily not "exceed one month" in duration. *Horne Bros*, 463 F.2d at 1271–73. As to a meaningful manner of hearing, courts in this circuit have likewise been clear that "when a process . . . is merely 'perfunctory,' there is no '*meaningful* opportunity to be heard.'" *Taylor v. Trump*, 823 F. Supp.

3d 17, 39 (D.D.C. 2026) (quoting *Sourbeer v. Robinson*, 791 F.2d 1094, 1101 (3d Cir. 1986) (emphasis added by *Sourbeer* court)). The agency "cannot merely go through the motions." *Id.* In the year-plus since Plaintiffs' suspensions issued, Defendants have still not provided meaningful process to Plaintiffs—who have responded diligently to ever-expanding and repetitive requests for documents and written positions, even while agency personnel have been unable to identify any example of an area of concern or continued basis for their suspensions. Dkt. No. 1 ¶ 158.

*Old Dominion* is instructive here. 631 F.2d at 955–56. In that case, the D.C. Circuit held that "when the Government effectively bars a contractor from virtually all Government work due to charges that the contractor lacks honesty or integrity, due process requires that the contractor be given notice of those charges as soon as possible and some opportunity to respond to the charges *before adverse action is taken*." *Id.* (emphasis added). The contractor in that case was denied work solely on an official's determination that it "lacked integrity"—a charge that "would follow [it] in any attempt to procure Government work[]" and that had "the effect of putting [it] out of business"—and the court held that this stigmatizing, business-ending exclusion deprived the contractor of a constitutionally protected liberty interest, invoking the rule that "'where a person's good name, reputation, honor, or integrity is at stake because of what the Government is doing to him, notice and an opportunity to be heard are essential.'" *Id*. at 963–64 (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972)). So too here: Defendants' suspensions of Plaintiffs coupled with Defendant Loeffler's public adoption of O'Keefe's defamatory narrative casting ATI as a fraudulent or corrupt organization have severely impugned Plaintiffs' reputations and have functionally stripped them of the ability to remain in business, all without first providing an opportunity to challenge the allegations.

As time was set to expire on the FAR suspensions—and still without any factual or legal

basis to take further action against Plaintiffs—on information and belief, the SBA enlisted the help of the DOJ to extend its timeline, exploiting a provision of the FAR that permits a six-month suspension extension at the request of the DOJ or another prosecuting official. 48 C.F.R. § 9.407–4(b). Any supposed DOJ investigation into ATI or the other Plaintiffs would be a farce—the SBA has no evidence of any wrongdoing by Plaintiffs, nor does the DOJ. No prosecutor, agent, or other law enforcement official has ever contacted Plaintiffs or requested information. Dkt. No. 1 ¶¶ 40, 167–75.

In any event, the suspensions remain unlawful: FAR 9.407–4(b)'s extension provision governs only the permissible duration of a suspension. It does not replace the need for adequate evidence, excuse the agency's failure to comply with FAR 9.407–1(b)(1) and 9.407–2(a), create an independent basis for suspension, or make a previously unsupported suspension lawful. *Art-Metal*, 473 F. Supp. at 6–7 (rejecting agency's argument that pendency of investigation justified suspension-like penalty of holding contractor's contract awards in abeyance). The extension therefore cannot substitute for the evidence the FAR requires, which does not exist in this case.

Defendants' imposition of the FAR suspensions and the public stigmatization that accompanied the suspensions, together with their manipulation of the agency machinery to keep Plaintiffs suspended at all costs—all without providing notice and an opportunity to be heard—is a paradigmatic due process violation. Plaintiffs are likely to prevail on the merits of their constitutional claim.

**2. Plaintiffs Will Suffer Imminent Irreparable Harm if a Temporary Restraining Order and Injunction Are Not Granted**

It is difficult to overstate the harm that the SBA's conduct has caused and continues to cause the Plaintiff companies; without the Court's swift intervention, they are unlikely to ever recover. Already, Plaintiffs have lost nearly $130 million worth of previously-awarded

government contracts as a result of the suspensions and the stigma associated with the suspensions, both of which were very publicly amplified by Defendant Loeffler. Within days of the issuance of the suspension, almost all of ATI's contracts were terminated, comprising *over 90%* of its monthly revenue, and it was disqualified from pursuing new business. Dkt. No. 1 ¶ 229. Nearly all of ATI's 67 employees have been laid off while the companies sit stagnant, unable to compete for the work that they are specially designed to perform. *Id.* ¶ 89.

The suspensions have effectively sent the Plaintiff companies into a death spiral. The *de facto* debarment and the SBA suspensions caused Plaintiffs' existing and future business opportunities to evaporate overnight. Without contracts in hand, the companies cannot afford to retain employees. And without employees, the company cannot maintain its infrastructure to get back to work once the suspension is lifted. The company's hard-earned reputation as a high-performing, reliable contracting partner continues to wither on the vine, overshadowed by the Defendants' baseless public allegations. If the Plaintiff companies remain unable to compete for government contracting work for much longer, years of strategic development and company growth will be erased. They would be starting from square one, all with the agency's defamatory accusations hanging as an albatross around their necks.

Further damaging ATI's prospects for recovery, eligible contractors are allocated a limited amount of time to participate in the 8(a) Program—generally a maximum of nine years from the date of program admission. 13 C.F.R. § 124.2. Every day that passes shrinks ATI's remaining program participation term and diminishes ATI's opportunity to benefit from the contracting assistance Congress established the 8(a) Program to provide to tribally-owned businesses.

Without an order lifting the suspensions, the Plaintiff companies face an imminent risk that they will never recover or that they will be forced to close their doors permanently. That is the

hallmark of irreparable harm. *See Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1329 (D.C. Cir. 2024) ("A business's 'destruction in its current form' commonly qualifies as irreparable harm.") (citing *Holiday Tours*, 559 F.2d at 843); *see also In re NTE Conn., LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) ("financial injury can be irreparable where no adequate compensatory or other corrective relief will be available at a later date . . . .") (citation modified) (quoting *Mexichem Specialty Resins, Inc. v. Env't Prot. Agency*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("Recoverable monetary loss may constitute irreparable harm" if "the loss threatens the very existence of the movant's business.") (citation omitted))).

Plaintiffs have been diligent in their pursuit of an administrative resolution that would allow their continued corporate recovery and survival without court intervention. Dkt. No. 1 ¶¶ 119, 136–140, 145–46. To that end, they have provided volumes of evidence refuting the threadbare allegations that underlie the suspension decisions in the hope that the SBA would consider their evidence in good faith and reach a reasoned and just resolution. But the SBA has taken a different tack, and even now—more than a year after it first suspended ATI—the agency still refuses to act in compliance with its own policies, past practices, and historic treatment of similarly situated contractors.

Defendants' steadfast refusal to undertake an evenhanded review of the evidence submitted, even after Plaintiffs' continued attempts to satisfy their concerns, justifies only one conclusion: there is no amount of evidence, no answer to any question, and no missing piece of testimony that will convince Defendants to act in good faith. Defendants' intransigence is the reason why Plaintiffs cannot obtain the company-saving relief that they need from the Defendants directly, necessitating this lawsuit. By giving Plaintiffs the run-around for over a year after the

suspensions, Defendants also robbed Plaintiffs of one of the most valuable resources to a company running on reserves: time. That means that Plaintiffs' risk of imminent closure is higher now than ever, and that the Court's urgent action enjoining the Defendants from maintaining their baseless FAR suspensions is necessary to keep Plaintiffs' businesses afloat.

### 3. The Balance of Harms and the Public Interest Favor Granting a Temporary Restraining Order and Injunction

The final two factors for the Court to consider in determining whether to grant a temporary restraining order and preliminary injunction—the balance-of-equities and public-interest factors—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. These factors unambiguously weigh in favor of granting Plaintiffs' request.

Assuming that Plaintiffs prevail in their threshold argument that they are likely to succeed on the merits, thereby demonstrating that the Defendants' ongoing suspension is unlawful, neither the public nor the government will be harmed by an order granting Plaintiffs their requested relief. "There is generally no public interest in the perpetuation of an unlawful agency action." *League of Women Voters*, 838 F.3d at 12. "To the contrary, there is substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Thus "the government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" *Climate United Fund v. Citibank, N.A.*, 778 F. Supp. 3d 90, 121 (D.D.C. 2025) (quoting *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 115 (D.D.C. 2020) (citation omitted)). Even though "the executive branch's general interest in managing public funds carries significant weight, that interest does not outweigh" Plaintiffs' interests in vindicating their rights. *Am. Bar Ass'n v. U.S. Dep't of Just.*, 783 F. Supp. 3d 236, 248 (D.D.C. 2025).

With the potential for existential harm to Plaintiffs and the substantial public interest in

having governmental agencies abide by the law both sitting on one side of the scale, and no countervailing interest in maintaining the unlawful suspensions on the other, the equities and public interest factors weigh entirely in Plaintiffs' favor.

**C. This Court Should Hold an Evidentiary Hearing on the Motion**

If any doubt remains as to Plaintiffs' entitlement to temporary injunctive relief, the Court should hold a hearing to elicit testimony from SBA witnesses regarding the basis of the suspensions. This Court permits such testimony "when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review." *Am. Petroleum Inst. v. S.E.C.*, 714 F.3d 1329, 1334 (D.C. Cir. 2013) (quoting *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010)) (internal quotation marks omitted); *see also DC Pres. League v. Dep't of Interior*, No. 1:26-cv-477-ACR, 2026 WL 3210227, at *12 (D.D.C. Oct. 26, 2026) (noting court took testimony from witnesses during preliminary injunction hearing because "the Court has . . . concluded that the 'strong showing of bad faith' and 'bare' administrative record . . . required extra-record discovery."). That standard is plainly met here. The administrative record in this case consists of innocuous corporate data and links to three misleading YouTube videos. Exh. 9; Dkt. No. 1 ¶ 23. The SBA suspended Plaintiffs without conducting any investigation or contacting any of the Plaintiffs. *Id.* ¶ 18. And in a meeting with Plaintiffs' counsel, SBA officials failed to provide any actual, reasonable basis for ATI's suspension. *Id.* ¶ 158. The paper-thin administrative record demonstrates that the suspensions are baseless and were issued in bad faith. If Defendants contend that the suspensions were warranted, the Court should permit Plaintiffs to scrutinize those contentions before ruling on Plaintiffs' motion.

### D. This Court Should Waive Rule 65(c)'s Security Requirement or Impose a Nominal Security

Plaintiffs respectfully request that the Court waive the Rule 65(c) security requirement or, in the alternative, require only a nominal bond. The rule contemplates plaintiffs providing security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). But the Court has discretion to waive the requirement. *See, e.g.*, *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) ("Courts in this Circuit have found the Rule 'vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond,' . . . including the discretion to require no bond at all.") (alteration in original) (quoting *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999)). The Court has exercised that discretion where, as here, "[r]equiring security . . . would serve no meaningful purpose" and where imposing a bond would "unduly burden Plaintiffs and potentially impair their ability to seek judicial relief . . . ." *N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 315 (D.D.C. 2025) (citation omitted). "[T]he risk of financial harm" to the agency in defending against Plaintiffs' motion for injunctive relief "is speculative at best." *Id.* Accordingly, Plaintiffs respectfully request that the Court exercise its discretion to waive the Rule 65 security requirement.

## IV. CONCLUSION

For more than twelve months, Plaintiffs have suffered blow after blow because of the SBA's bad faith actions. Plaintiffs have begged and pleaded with the SBA to right its wrongs, but, as is unfortunately common in today's Executive Branch, the SBA refuses to follow the law or engage in good faith. Plaintiffs have come to the courthouse door because they have nowhere else to go. Because the "executive branch may not act free from any judicial oversight," *DC Pres. League*, 2026 WL 3210227, at *36, this Court should enter the requested TRO and preliminary injunction.

Respectfully submitted,

Dated: October 30, 2026

**MORGAN, LEWIS & BOCKIUS LLP**

/s/ *Justin D. Weitz*
Justin D. Weitz (Bar No. 90008910)
Robert Sassan (*pro hac vice* forthcoming)
1111 Pennsylvania Avenue, NW
Washington, DC 20004
justin.weitz@morganlewis.com
robert.sassan@morganlewis.com
Phone: +1.202.739.5932

Matthew D. O'Keefe (*pro hac vice* forthcoming)
One Federal Street
Boston, MA 02110
matthew.okeefe@morganlewis.com

**PILIEROMAZZA LLC**

/s/ *Matthew E. Feinberg*
Matthew E. Feinberg (Bar No. 991638)
Caitlin E. Trevillyan (Bar No. 888155614)
Kane T. Smith (Bar No. 90007778)
Shelleah Cannon (*pro hac vice* forthcoming)
1001 G Street NW, Suite 1100
Washington, DC 20001
mfeinberg@pilieromazza.com
ctrevillyan@pilieromazza.com
ksmith@pilieromazza.com
scannon@pilieromazza.com
Phone: +1.202.857.1000

**HONIGMAN LLP**

Mark J. Cipolletti (Bar No. 90031300)
1440 New York Avenue, NW, Suite 200
Washington, DC 20005
mcipolletti@honigman.com
Phone: +1.202.521-0569

**THOMPSON HINE LLP**

Edward T. DeLisle (Bar No. 90014838)
1919 M Street, N.W., Suite 700
Washington, D.C. 20036
edward.delisle@thompsonhine.com
Phone: +1.202.973.2725